**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| RICHARD ALLEN BENSON,<br>*Petitioner-Appellant*,<br><br>v.<br><br>KEVIN CHAPPELL, Warden, San Quentin State Prison,<br>*Respondent-Appellee.* | No. 13-99004<br><br>D.C. No.<br>2:94-cv-05363-AHM<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Alvin Howard Matz, District Judge, Presiding

Argued and Submitted December 5, 2017
Submission Vacated February 7, 2019
Resubmitted April 24, 2020
Pasadena, California

Filed May 1, 2020

Before: Consuelo M. Callahan, Carlos T. Bea,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Callahan;
Partial Concurrence and Partial Dissent by Judge Murguia

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Richard Allen Benson's habeas corpus petition challenging his California conviction and death sentence for murder and other crimes.

Benson raised two certified claims on appeal: (1) that his confessions should have been suppressed, and (2) that his trial counsel was ineffective at sentencing. Reviewing under the Antiterrorism and Effective Death Penalty Act, the panel held that Benson did not show that the California Supreme Court's denials of his claims were unreasonable determinations of the facts or contrary to clearly established federal law.

Observing that – as Benson admits – he confessed after he was given his *Miranda* warnings, acknowledged the warnings, and waived them, the panel held that the California Supreme Court reasonably determined that an officer's misstatement during Benson's interrogation that there was no death penalty in California did not prompt Benson's confessions; and that Benson did not show that his statements were not knowing, voluntary, and intelligent.

The panel held that even if Benson were able to show that trial counsel was ineffective in not fully investigating his abuse as a child or his alleged organic brain injury, the California Supreme Court could reasonably have determined

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that any shortcoming in trial counsel's investigation was not prejudicial.

The panel granted a Certificate of Appealability on Benson's two uncertified issues and determined that the state court reasonably rejected his claims that (1) his trial counsel was ineffective at the guilt phase of the trial, and (2) the prosecutor withheld material, exculpatory evidence.

Concurring in the majority's decision on the first certified issue and on the uncertified claims, Judge Murguia dissented from the majority's opinion with respect to Benson's penalty-phase ineffective-assistance claim. She wrote that significant and readily-available evidence that Benson was subjected to grotesque sexual and physical abuse, which was never discovered by Benson's lawyer and never introduced at the penalty phase, has a substantial probability of convincing at least one juror to vote for life rather than death, and that the California Supreme Court's conclusion to the contrary is fundamentally unreasonable.

## COUNSEL

Marcia A. Morrissey (argued), Santa Monica, California; John R. Grele (argued), San Francisco, California; for Petitioner-Appellant.

David F. Glassman (argued) and A. Scott Hayward, Deputy Attorneys General; James William Bilderback II, Supervising Deputy Attorney General; Lance E. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney

General; Xavier Becerra, Attorney General; Attorney General's Office, Los Angeles, California; for Respondent-Appellee.

**OPINION**

CALLAHAN, Circuit Judge:

In 1986, Richard Allen Benson confessed to sexually molesting two little girls and murdering the girls, their mother, and their baby brother. He was tried and convicted for murder and other crimes and sentenced to death. After his conviction and sentence were affirmed and the California Supreme Court had denied several habeas petitions, Benson filed a federal habeas petition with the United States District Court for the Central District of California. The district court denied the petition and Benson has appealed.

On appeal Benson raises two certified claims: (1) his confessions should have been suppressed, and (2) his trial counsel was ineffective at sentencing because he failed to investigate and present evidence of Benson's severe physical, sexual, and emotional abuse in early childhood. In addition, Benson raises two uncertified claims: (3) trial counsel was ineffective at the guilt phase in failing to impeach the state's case, and (4) the prosecutor withheld material and exculpatory evidence (a claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963)).

Because Benson's claims are subject to review under the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, to be granted relief, he must show that the California Supreme Court's denials of his claims were

unreasonable determinations of the facts or contrary to clearly established federal law. Benson has not done so. He confessed after he was given his *Miranda* warnings, acknowledged the warnings, and waived them. The California Supreme Court reasonably determined that an officer's misstatement during Benson's interrogation that there was no death penalty in California did not prompt Benson's confessions. Furthermore, Benson has not shown that his statements were not knowing, voluntary, and intelligent. In addition, even if Benson were able to show that trial counsel was ineffective in not fully investigating his abuse as a child or his alleged organic brain injury, the California Supreme Court could reasonably have determined that any shortcoming in trial counsel's investigation was not prejudicial. Finally, we grant the Certificate of Appealability on Benson's two uncertified issues and determine that the state court reasonably rejected Benson's claims that (a) his trial counsel should have impeached the government's case, and (b) the prosecutor withheld material, exculpatory evidence. Accordingly, we affirm the district court's denial of the writ.

## I. The Underlying Facts

### A. Benson's Criminal Activities

There is overwhelming evidence that Benson deliberately murdered Laura Camargo and her two-year old son, and sexually molested her four-year-old and three-year-old daughters, before brutally murdering both girls. He then set the family's home on fire and fled the scene.

The California Supreme Court's opinion provides this recitation of the underlying facts:

On the evening of Saturday, January 4, 1986, Laura Camargo set out to visit Barbara Lopez and Katrina Flores. The three women were close friends. Laura lived in Nipomo with her children, Stephanie Camargo, age four, Shawna Camargo, age three, and Sterling Gonzales, age twenty-three months, in a small, two-room shack that shared an unattached bathroom with another unit. Barbara and Katrina lived with their children in an apartment in Oceano, which was about 10 miles away. Just before Thanksgiving of 1985, defendant had moved into the apartment; he was a jeweler by trade. Over the following weeks, he became acquainted with Laura and her children.

On the evening in question, Laura secured a baby-sitter to care for Stephanie, Shawna, and Sterling, and then obtained a ride to Oceano. She socialized with Barbara, Katrina, and defendant. Before long, she decided to return home. Defendant arranged for a ride. Taking measures to conceal his destination from Barbara and Katrina, he accompanied Laura to Nipomo, carrying with him a heavy briefcase. As he later admitted, he "went out there with the intention of doing something to the kids."

Around midnight, defendant and Laura arrived at the shack, and the baby-sitter departed. Shortly thereafter, defendant took up a claw hammer he found in the shack,

apparently positioned himself behind Laura, and repeatedly and violently struck her in the head, as he subsequently acknowledged, "to take her out." Laura fell; defendant thought she was dead; she gurgled loudly; he stuffed socks into and over her mouth; she soon expired. From that point on, he took pains to make it appear to Laura's neighbors that no one was in the shack. He proceeded to sexually assault Stephanie and Shawna.

Throughout Sunday, January 5, defendant continued to molest the two girls. A number of times that day, neighbors came by the shack and the common unattached bathroom. More than once, Sterling coughed and cried; more than once, defendant quieted the child. After nightfall defendant—in words he later used—"realized . . . that it was inevitable": in order to avoid discovery, he decided to kill Sterling. Although he met with resistance from the child as he attempted to smother and strangle him to death, he finally succeeded. With Laura and Sterling dead, he found himself in what he later described as "a molester's type of heaven": in the paraphrase of the police psychiatrist to whom he confessed, "it was like being in heaven, and being completely able to get what he wanted with no interference."

As Monday, January 6, approached, defendant continued to molest Stephanie and Shawna. At the same time, he began to consider

whether he should kill the girls. As he later described his thoughts: "I knew it couldn't be put off and uh, in the state of mind that I was in at that time, the best thing, no I can't say it like that, the only option I had was to go ahead and finish the job and uh, try to keep from being implicated in it, okay. Uh, I had trouble bringing myself to do it. . . . [A]nd uh, you know, three, four times I set them up for it and I, I just couldn't do it. . . ." As the sky began to lighten, however, defendant found himself able to carry through. He took up a heavy steel jeweler's mandrel which he carried in his briefcase; he repeatedly struck Stephanie and Shawna in the head; seeing that death did not come immediately, he seized the claw hammer and used the instrument to dispatch the children. As he subsequently admitted, he killed Stephanie and Shawna, and Laura and Sterling before them, "to protect my freedom." To cover his crimes, he proceeded to start a fire in the shack. About 8 a.m., just before the flames began to rage, he fled.

*People v. Benson*, 802 P.2d 330, 336–37 (Cal. 1990).

On Monday morning, January 6, 1986, Mike Owen stopped by a liquor store in Nipomo. Benson approached him and asked for a ride to Oceano. Owen agreed. Benson retrieved his briefcase and was dropped off in Oceano just after 8:00 a.m. At around this time, smoke was seen coming from Laura's home and the fire department was called. The

home was heavily damaged and charred. According to the district court:

> Laura's three children, Stephanie, Shawna, and Sterling, were all dead, on the floor in the middle of this room, which the fire had heavily damaged. A lot of burnt and partially burnt debris was under and around the girls' bodies and on the floor of the second room. A pink and black, wire-ribbed female corset was next to Stephanie's body.
>
> A partially-burnt claw hammer was lying on top of Stephanie's shoulder. Petitioner's ring mandrel was lying next to Shawna. Another hammer was hanging on the wall next to the kitchen sink.
>
> Investigators found pornographic magazines, newspapers, and a photo album under the two girls' bodies. . . .
>
> The arson investigator . . . examined the fire, and determined someone had deliberately set on fire the surface of a four foot wide pile of magazines, paper goods, clothing, and toys, in the middle of the children's room next to and underneath the bodies of Stephanie and Shawna, allowing it to burn down into the pile.

On Tuesday, January 7, Benson asked a friend of a friend, K.S., for a ride to Los Osos, a town north of San Luis Obispo. K.S. agreed to give him a ride as far as San Luis Obispo,

Benson picked up his belongings, and they left for San Luis Obispo around 6:30 p.m. They drove to an apartment complex where Benson got out and asked K.S. to wait while he went inside. When Benson returned, he started gathering his belongings, then he grabbed K.S. from behind, put a knife to her throat, and ordered her to drive to Los Osos. K.S. panicked and offered Benson her car. He rejected the offer and "took out a cylinder with something like a needle sticking out of it and told her it would kill her if he pricked her with it."

Benson made K.S. drive to a liquor store in San Luis Obispo where he forced her to buy a bottle of whiskey and pornographic magazines. They returned to the car and Benson forced her to continue driving to Los Osos. When they got there, Benson said he was on a mission to rescue a family in Los Osos.[1] They talked in the parked car for more than an hour until Benson made a phone call. K.S. was terrified of Benson, who remained within reach of her. Benson made K.S. drive to an abandoned house, where he eventually got his things out of the car and went inside. K.S. drove straight home to San Luis Obispo and called the police.

---

[1] The district court noted:

> Petitioner claimed he knew a police officer in Los Osos who had been suspended for molesting an 11 year-old girl, and was producing and filming a home-made pornographic movie in which he was forcing his wife and two daughters to participate. Petitioner claimed he had borrowed some pornographic magazines from the policeman, and, under the guise of returning them, he would go to the policeman's house to rescue the two girls.

Later that night, K.S. accompanied the police to the abandoned house in Los Osos. The police went to the house and arrested Benson. Benson was booked at around 11:30 p.m. on Tuesday, January 7, in connection with the kidnaping of K.S.

On Wednesday, January 8, Benson's parole agent, Felix Martel, was notified of Benson's arrest. Benson had four prior felony convictions for abducting minors. Martel went to the San Luis Obispo County Sheriff's Office to discuss the matter with detectives. He authorized the breaking of the lock on Benson's briefcase to conduct a parole search, and he placed a parole hold on Benson. Law enforcement officers spent Wednesday consolidating and reviewing the evidence they had concerning the murders.[2] On Thursday morning, based on evidence pointing toward Benson as responsible for the murders, the Sheriffs Office called someone with the FBI's Behavioral Science Unit to discuss how best to approach a pedophile like Benson.

**B.  Benson's Confessions**

Detective Bolts and Investigator Hobson began interviewing Benson in an office at the San Luis Obispo County Detective Bureau around 11:00 a.m. on Thursday, January 9, 1986. Benson was initially detained on a parole hold based on his kidnaping of K.S. At the beginning of the interview, Bolts read Benson his *Miranda* rights, and Benson indicated that he understood his rights and waived them. A portable transmitter in the room monitored the conversation and relayed it to another room where other investigators

---

[2] Benson had been interviewed briefly at his home on the afternoon of January 6, 1986.

could listen to, and record, the interview.  All but the initial one and one-half hour to two hours of the almost twelve-hour interview was tape-recorded.

The officers initially focused on a charge of kidnapping K.S. but then shifted their focus to the events that occurred at Laura Camargo's home in Nipomo.  Bolts commented:  "I think we could perhaps start anew and talk about some things that occurred Saturday night and talk some straight turkey." Bolts continued, "I think you only realize too well that we didn't call you in here without having done our homework." Benson responded that he had "known that for quite awhile" and that, "as it looks right now, I'm a very suspected man." The following colloquy ensued:

> Hobson:  What's going through your head right now Richard?
>
> Benson:  I don't think you'd believe it.
>
> Hobson:  I'd like to believe it, try me. We sat here with you all this time and that's why we're still here with you, because we care also.
>
> Bolts:  We're caring, feeling, human beings and we have compassion for a lot of things and we've seen a lot worse, believe me, this is not the end of the line by any means.
>
> Hobson:  Richard, if we didn't care, we wouldn't be sitting here.

Benson: I don't see, I don't see how you can say it's not the end of the line.

Bolts: It's not.

Benson: It is for me.

Bolts: Why? There's no death penalty here.

Benson: That doesn't matter.

Hobson: Wait a minute, before we talk about that, we don't know what happened in that house . . . [.]

Bolts: Exactly. We know what kind of a person Laura could be.

Hobson: Laura had a temper. We know that. Maybe you were put into a position where you had to make a choice.

Benson: It doesn't matter what choices I had.

Hobson: Sure it does.

Benson: No, because nothing justifies the outcome.

Hobson: Well, why don't you tell us and let us decide that.

Benson: The thing ot [sic] it is, I can't.

Hobson:  Why?

Benson:  I don't know.

Hobson:  You don't know what?

Benson:  I don't know what happened.

*Benson*, 802 P.2d at 841 n.3.

Benson claimed he could not tell the officers what happened because he could not remember.  However, after telling the officers a number of lies, Benson admitted he committed all the murders and sexually molested Stephanie and Shawna for 30 hours before he killed them.  Benson's admissions were laced with inconsistencies about how and why he committed the acts.  The officers finally terminated the interview around 11:00 p.m., returned Benson to jail, and booked him on murder and other related charges.

Later that night, Benson was placed on "suicide watch" and placed naked into a small empty cell with foam rubber padded walls and a bare concrete floor—a so-called "rubber room."  *Id*. at 346.  He was told by a jailer that he would not be released until he was cleared by "Mental Health."  *Id*.

On the morning of January 10, 1986, Dr. Gordon of the Sexual Assault and Response Team visited Benson. Dr. Gordon testified that he told Benson that he was a doctor and he advised him of his constitutional rights including the right to remain silent and the right to an attorney.  Dr. Gordon stated that Benson agreed to talk to him and that Benson proceeded to describe his sexual molestation of the two girls in some detail.

On January 13, 1986, Bolts and Hobson interviewed Benson for another three hours. Benson was again advised of his *Miranda* rights and waived them. During the interview he provided further details of the crimes. Near the end of the interview, the following dialogue transpired:

> Bolts: . . . [J]ust so that I'm clear, is there something that we've said uh, as far as, you know, threats that we've made to you, promises or any promises of leniency, anything that has caused you to tell us what you've told us?

> Benson: No. I'm surprised that that came up.

> Bolts: Well, I, it's something that uh, you know, I've thought of, that maybe something that we said you interpreted as some kind of threat or promise or some . . .

> Benson: You know what, if you guys started whipping me with billy clubs right now, you'd see me smile, so you know that's not uh, a . . . now, no, you guys are good at your job, I complimented you to your lieutenant about it as a matter of fact, uh, I'm glad you are, because it served in getting me off the street, you know, I feel that in some sick twisted way I helped a little, but you guys still . . . you did your job.

## II. Judicial Proceedings

### A. The Indictment and Appointment of Counsel

On January 14, 1986, Benson was arraigned. He was charged in a 14-count complaint with murder, child molestation, arson, and kidnapping. That afternoon he appeared in court and was advised of his right to counsel. Although Benson initially said he did not want an attorney, the court appointed counsel, and advised Benson that the charges carried the possibility of the death penalty. After conferring with counsel, when Benson was again asked whether he wanted counsel, he responded:

> I do desire counsel, your honor. It turns out, in my interrogation with the deputies, I was led to believe that, according to them, California no longer had a death penalty. Because of that, we were just talking years, not life. Because of that, I didn't feel that the expenditure of the court was warranted in something that was inevitable to happen.

### B. The Motion to Suppress

On February 26, 1987, the first day of trial, the court ruled on Benson's motion to suppress his confessions to the officers. The court first rejected his arguments that: (1) Benson's arraignment had been delayed in order to elicit incriminating statements; and (2) Benson was entitled to a second *Miranda* warning when the subject of the questioning changed from kidnapping to homicide.

Benson testified at his suppression hearing.  Benson explained that when Detective Bolts commented that there's "no death penalty here," Benson thought Bolts meant that "the death penalty was dormant in California, and that they weren't seeking the death penalty as far as what the interview, what the case was going to."  When asked to explain his response "that doesn't matter" to Bolts's statement about the death penalty, Benson testified that "[a]t the time, the incidents were very fresh and vivid in my mind, and I was having a lot of trouble dealing with the whole situation."  Benson further stated that his "primary thought was nothing was going to change the effect of the people that died.  Nothing was going to bring them back."  When asked why he gave information to the police, Benson testified that "there's no one answer to that."

The judge carefully considered the possible impact on Benson of Bolts's indication that there was no death penalty. The judge noted that Benson "is very articulate, very well-spoken, seems to the Court having read this transcript, that he's an intelligent young man," and that, by his own account, he is experienced in the criminal justice system.  The court, having reviewed the transcript of the interrogation, opined that Benson had been focusing on the horror of the situation and did not rely on the officer's statement.  The judge also noted the passage of time between the officer's statement and Benson's eventual admission of what he had done.  The judge concluded that he was "persuaded beyond a reasonable doubt that Mr. Benson's statements were not coerced by promise of leniency, but rather were made freely and voluntarily."

### C.  The Motion to Exclude Dr. Gordon's Testimony

When Dr. Gordon was called as a witness, Benson's counsel moved to exclude Benson's statements to Dr. Gordon as involuntary.  The district court described counsel's argument as follows:

> the reason that Mr. Benson was so willing to speak to Dr. Gordon was his desire to vacate the - - what we have referred to as the rubber room.  And in an effort to get out of that confinement, he was willing to open up and speak to Dr. Gordon.  That that was, in effect, a ruse or a scam on behalf of the police in that there was a suggestion that he would be speaking to someone from Mental Health, and that they substituted in that person's stead Dr. Gordon who came in and then proceeded to ask and obtain - - ask questions and obtain incriminating statements.

The trial court denied the motion to exclude and noted that it seemed clear "that Mr. Benson was going through some terribly draining emotional feelings," and "that in his own heart and mind he felt it was necessary to get this off of his chest and to speak to somebody about it."

### D.  The Guilt Phase

The guilt phase of the trial began on February 26, 1987, and took less than four days.  Defense counsel examined two

prosecution witnesses out of order in an attempt to show that Benson was a regular drug user, but offered no affirmative defense once the prosecution rested.  Defense counsel told the trial judge, out of the jury's presence, that once Benson's pre-trial statements were admitted, their tactical decision was to concentrate on the penalty phase because they thought the result of the guilt phase was a foregone conclusion.  On March 4, a jury found Benson guilty of the charges.

## E.  The Penalty Phase

At the penalty stage, the prosecution presented the kidnapping of K.S. as aggravating subsequent criminal activity.  They also presented Benson's four prior felony convictions.  In 1971, when Benson was 24 years old, he was convicted of committing a lewd and lascivious act on a nine-year-old girl he had kidnapped as she was walking down the street.  In 1975, Benson was convicted of kidnapping an eight-year-old girl from her bedroom where she was sleeping.  In 1975, he was also convicted of lewd and lascivious acts on a three-year-old girl that he had taken from her mother's house.  In addition, in 1980, Benson was convicted of kidnapping a four-year-old girl he had taken from her bedroom while she was sleeping.  As part of its case, the prosecution played the tapes of Benson's January 9 and 13 confessions in full for the jury.

The tapes revealed that Benson had made a number of statements to the officers about how Laura had encouraged

him to sexually abuse her daughters[3] and how his inhibitions had been overcome by his use of methamphetamine.[4]

---

[3] Benson stated that Laura encouraged him to molest the children, possibly in return for payment of money. When asked what Laura would allow him to do, Benson stated:

> Anything that didn't hurt them. You know, they were too small for penetration or anything like that. Basically fondle, you know, and uh, I, you know, what's important . . . this is believe it or not kind of funny, uh, I was the one that told her, you know what, I don't want any of this to come out to where it leaves any lasting bad memories on the kids. And uh, she goes, what do you mean and I says . . . if for some reason, you know, they're uncooperative, we drop it and she goes, well, my kids will do what I tell them to. And I said, that is what I'm saying, you know, I don't want to talk, coerce or anything into something that later they will, you know, and, uh, she goes, man, you're weird and uh, you know, I tell her that that was right . . . .

[4] In responding to questions about the pornography in his briefcase and Laura encouraging him to molest her daughters, Benson commented:

> Yeah, you know, and uh, the pictures have been what has been keeping me out of trouble, okay, the only time I have problems with this is when I do crank, okay, needless to say, if I had any sense at all, I'd quit doing crank. Alright, uh, I like doing crank. I don't like the end result, you know, and sometimes I get wired and start thinking about little girls and stuff like this and that's when the briefcase comes in, you know, it keeps me off the streets, okay. Uh, the only thing I can say is it's worked, you know, and I have cut back my use of crank. Okay.

In response to the prosecution's presentation, Benson's counsel called a number of witnesses to show that Benson had a very difficult childhood and was addicted to drugs. Counsel called Benson's brothers Dale Snow and Brad Benson.[5] Dale testified that, when he was one year old, he was sent to live on a ranch near Petaluma run by Marjorie Buchanan, and that all his brothers were also sent to the ranch. Dale identified a photo of the brothers taken at Easter at Aunt Grace's home in San Francisco when Benson was seven or eight. He described Aunt Grace as being "very supportive of the family and instrumental in having holidays for all of us." Dale then testified that when he was ten, and Benson nine, the brothers were returned to the custody of their alcoholic father. Brad also testified that all the brothers had lived on Marjorie Buchanan's ranch until their father instituted proceedings to have them returned to his custody. Neither Dale nor Brad offered any criticism of life on the ranch in their testimony.

Both Dale and Brad described the difficulties of the approximately three years they lived with their father before the state removed them from his custody. They first went to an apartment where their father, their "stepmother," and their sister lived. The district court noted that within weeks the family was evicted, and for the next three years they lived "in seedy, skid row hotels, houses, apartments and shanties, including a converted chicken coop, never staying in any one place more than a few months or the time it took for the manager or landlord to realize that no rent was forthcoming." The father, a chronic alcoholic, was always unemployed and

---

[5] To avoid confusion the brothers, Dale and Brad, are referred to by their first names, and the petitioner, Richard Benson, is referred to by his last name.

looking for money. The boys continually attended different schools, and worked at whatever odd jobs they could find. Dale and Brad testified that they were alcoholics and that their brothers, Bill, David, and Teddy Joe were also alcoholics.

The defense also called Benson's sister, Sandra Bradley, who testified that both their father and mother were alcoholics and confirmed that when her brothers came to live with them they "moved a great deal." In three years she attended three or four different schools.

Defense counsel had Grace Ehlig O'Brien, a retired high school principal and teacher, testify that she remembered Benson when he was in seventh grade for three-to-four months before being sent to juvenile hall. She identified a summary paragraph from Benson's school records that read:

> Boy told vice-principal and later grade counselor that no one cared for him or wanted to listen to his problems. He said that no one believed him when he told the truth. He wants to be with his brothers and sister. He says he blames his parents for many of his present problems and he feels quite strongly about this.

The note concluded that Benson "[w]ants to be an electrician. Likes to take radios apart, likes reading, dislikes math."

Counsel called Holmes R. Benson, Benson's uncle, as a witness. He testified that Benson's father was an alcoholic—who was secretive, unreliable, and would at times

ask for financial assistance.[6] On cross-examination, Holmes testified that he had arranged for Benson to get a job and outfitted him "with the necessary welding equipment, helmet, a jacket, gloves," but he was employed only for three-to-six months.

In addition, Mary Pat Degroodt, a chemical dependency nurse who had worked with Dale Snow, testified that alcoholism can run in families, that Benson was a member of a dysfunctional family, and that she thought that he had a chemical dependency.

Defense counsel recalled Officer Bolts to the stand to testify that a person who knew Benson and had previously testified, had told the officer: "[Benson] often goes up to Katrina's room long periods of time, stares [sic] out window. Often gets up, leaves early in a.m. [sic], does crank often dash every day."[7]

Dr. Gregory Hayner, a pharmacist at the Haight-Ashbury Free Medical Clinic, testified that he had interviewed Benson for two hours. Dr. Hayner expressed the opinion that at the time of the murders, Benson was "very, very paranoid." He continued:

---

[6] In addition, the defense called Mr. Gunville, a social worker with the State of Washington, who testified that Benson's father was an alcoholic and had refused to address his alcoholism. He further testified that the father had been in a documentary film about the homeless in Seattle.

[7] Officer Bolts also testified that the person used "crank" to refer to methamphetamine.

And by the effects of the drug and lack of
sleep, being very disoriented and unable to
think very clearly, or really formulate many
cogent plans about what he was going to do at
any given time, and tended to react to the
situation at hand rather than acting out on a
set-out plan.

Dr. Hayner concluded that Benson's ability to conform his
conduct to the requirements of the law was "definitely
impaired," that he heard and saw things that were not there,
and that he was "suffering a toxic psychosis at the time due
to chronic intoxication with amphetamines."

Dr. Gene Abel, a neurologist and psychiatrist and an
expert in sexual violence and the evaluation and treatment of
sex offenders, also testified for the defense. At counsel's
request, Dr. Abel had first examined Benson in August 1986.
Dr. Abel had reviewed approximately 280 pages of
information on various evaluations of Benson, had given
Benson a variety of tests, and had interviewed him for about
12-to-13 hours. Dr. Abel opined that Benson had a number
of psychiatric disorders, including paraphilia, which in his
case is a sexual deviation of pedophilia. He explained in
some detail that Benson's ability to conform his behavior had
been impaired by his paraphilia.[8]  In reviewing Benson's

---

[8] Dr. Abel explained that a person suffering from paraphilia surrounds
himself with cognitive distortions.

"Molesting the child won't hurt child." That is a faulty
belief. "I can predict if I molest a child, which child
will be hurt in the future." That is a faulty belief. That
isn't true. "If I'm not using force, it's no harm to the
child." That's a false belief. There are a variety of

records, Dr. Abel was very critical of the prior psychiatric treatment of Benson, opining that when "talk therapy" failed to help Benson to overcome his psychiatric problems, Benson "should have been placed on a medication to eliminate his arousal."

Dr. Abel also opined that Benson had a drug dependency with a variety of drugs, particularly amphetamines. He explained that for Benson the effect of amphetamines "starts from starting to feel good to misperceiving the realities of the situation, feeling that you have skills that you do not have, feeling that you have abilities that you do not have. You start getting frightened and scared to what would be called delirium."

Dr. Abel admitted that, based on his prior convictions, Benson was clearly dangerous and was likely to molest children. However, because Benson was manipulative and could "access children easily," he didn't "need to kill somebody." He opined that the murders were "out of character" and the result of the combination of Benson's pedophilia and drug dependency.

Benson's counsel also played a video of a program on San Quentin from the television series, "Two on the Town," "which depicted the gas chamber, described how it operates, explained how one sentenced to die is executed, and provided background."

The jury returned a verdict that the aggravating factors outweighed the mitigating factors and fixed the penalty at

these cognitive distortions that the offender surrounds himself with and begins to think and really believes in.

death. The jury provided no written statement in support. *Benson*, 802 P.2d at 365. On April 30, 1987, Benson was given the death sentence.

## F. Direct Review

On appeal, the California Supreme Court struck two witness-killing special circumstances, but otherwise confirmed Benson's conviction and death sentence. *Benson*, 802 P.2d at 366. The court reviewed the voluntariness of Benson's confession "independently in light of the record in its entirety." *Id.* at 343. It concluded that the trial court did not err in denying the motion to suppress and that "the court properly concluded that the confessions were voluntary beyond a reasonable doubt." *Id.* at 344. The California Supreme Court concluded that even "[e]xamined de novo, each of the [trial] court's crucial determinations is sound." *Id*. The court explained, first, "the police activity here was clearly not coercive." *Id.* "Second, Detective Bolts's comment about the death penalty did not constitute a promise of benefit."[9] *Id*. "Third, Detective Bolts's comment

---

[9] The court reasoned: "Hobson's words effectively 'withdrew' the remark. And as defendant himself conceded at the hearing, the remark was not 'renewed': the officers '[n]ever again discuss[ed] the matter of the death penalty with' him." *Benson*, 802 P.2d at 345.

about the death penalty did not operate as an inducement."[10] *Id*. at 345.

The California Supreme Court also rejected Benson's argument that his statements to Dr. Gordon should have been suppressed. Reviewing the record de novo, the court agreed with the trial court's implicit determination that Benson's confession was voluntary. *Id.* at 346. It reasoned: (1) "defendant was properly advised of, and effectively waived, his *Miranda* rights - - nor does he claim otherwise"; (2) "of crucial importance, the necessary element of coercion

---

[10] The California Supreme Court explained:

> On this record, it is difficult to conclude that the remark was even a cause-in-fact of the confessions. To Bolts's observation, "There's no death penalty here," defendant immediately responded, "That doesn't matter." The evidence practically compels the inference that insofar as the confessions were concerned, the comment in fact "didn't matter." We recognize that the remark preceded defendant's confessions. The intervening period of time, however, was not insubstantial. Moreover, temporal priority does not establish causal force: it is a logical fallacy to reason *post hoc ergo propter hoc*. In any event, the evidence simply does not support an inference that the causal connection between Bolts['s] comment and defendant's confessions was more than "but for." As explained above, however, causation-in-fact is insufficient.

> Again, it is true that defendant testified that he was indeed induced to confess by the comment. But again, the court clearly, albeit impliedly, found his testimony lacking in credibility. Again, on this record we must agree.

*Benson*, 802 P.2d at 345.

on the part of the authorities is lacking"; (3) "there was no promise or deception by the authorities"; and (4) "defendant made his confession freely out of compunction." *Id*. at 346–47.

## G. Post-Conviction Proceedings

Benson filed his first state habeas petition in January 1993 with the California Supreme Court. He argued that his confessions to the police and Dr. Gordon were involuntary based on "severe psychological, neurological and developmental impairments." He relied on psychologists and psychiatrists who opined that Benson had brain damage caused by "in utero toxin exposure, anoxia, head trauma, and solvent inhalation," as well as voluntary drug use, and also head injuries from physical abuse and a near drowning incident. Experts also asserted that Benson suffered from dis-associative disorder and Post-Traumatic Stress Disorder. Dr. Abel, who testified on Benson's behalf at trial, supplemented his prior diagnoses and now opined that Benson's neurological and psychiatric impairments rendered him an unreliable witness and that all of Benson's statements should be viewed skeptically.

In addition, the habeas petition alleged ineffective assistance of counsel at the penalty phase based on counsel's failure to investigate and present evidence that Benson's two-to-three years on the Buchanan farm were horrible, and that Benson suffered from an organic brain injury. In support of this claim, Benson alleged that on the Buchanan farm he and his brothers were subject to sexual, emotional, and physical abuse. He was beaten until bloody with various objects, including a belt buckle, his hand was intentionally burned on a stove, and soap and cayenne pepper were forced into his

mouth. Allegedly, Benson "developed psychotic behavior (in response to the beatings), which, for example included his withdrawing and becoming quiet, banging his head against the wall, and eating dirt and live bugs." The petition alleged that Benson was "fondled, sodomized, beaten in the genitals, given frequent and repeated enemas, and forced to perform sexual acts with the farm animals." The petition further alleged that David, Marjorie Buchanan's son, caused Benson to be "fondled, sodomized, digitally raped, orally copulated, forced to orally copulate David, raped with foreign objects including a cattle prod and tied to a tree or a chair, molested, and then left naked and tied for hours."[11] However, the habeas petition also alleged that Benson had "no memory of the torture, and sexual, psychological and emotional abuse he suffered on the Petaluma farm."

On May 12, 1994, the California Supreme Court denied the habeas petition "on the merits," with no further explanation.

In February 2001, Benson filed a third habeas petition with the California Supreme Court.[12] In this petition, Benson argued his Fourth Amendment rights were violated because he was not arraigned within 48 hours of his arrest as required by *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991). The court denied the petition on its merits without explanation.

---

[11] In addition, the petition asserted that David was a Boy Scout leader, and in 1956, the year Benson left the farm, David was convicted of sexually molesting members of a Boy Scout troop.

[12] A second habeas petition was denied in August 1997, but none of the claims asserted therein are at issue in this federal petition.

## III.  District Court Proceedings

Benson filed his federal habeas petition with the United States District Court for the Central District of California in April 1997, and amended it in August 1997.  After California moved for summary judgment, Benson was allowed to file a second amended petition.  On February 28, 2013, the district court issued a 373-page memorandum and order granting summary judgment in favor of California and denying Benson's request for an evidentiary hearing.

Because Benson filed his habeas petition after April 24, 1996, the district court reviewed the petition under AEDPA's deferential standards.  *See Woodford v. Garceau*, 538 U.S. 202, 207 (2003).  Accordingly, relief is available only if the last-reasoned state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991).  The district court described the standard of review: where "a state court adjudicates the merits of an issue without providing its underlying reasoning, as it did here in the case of petitioner's four state habeas petitions, the federal court conducts an independent review of the record to determine whether the state court's resolution of the issue constitut[es] an objectively unreasonable application of clearly established federal law."  It further noted that where a state court "has not decided an issue, the federal court reviews that question de novo."  However, it recognized that in *Harrington v. Richter*, 562 U.S. 86, 101 (2011), the Supreme Court held that a federal court may not grant relief just because it would have reached a different conclusion; rather, a "state court's determination that a claim lacks merit precludes federal

habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *See also Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

## A.  The Admissibility of Benson's Confessions

The district court first addressed Benson's challenges to the admissibility of his statements to Detective Bolts, Investigator Hobson, and Dr. Gordon.  Benson argued that the tape recordings of his statements to Bolts and Hobson were unreliable and inaccurate.  The district court rejected this contention, noting that Benson had identified no clearly established federal law that required complete accuracy in tape-recordings and transcriptions of uncoerced admissions. The district court found that "the California Supreme Court could reasonably have concluded, on the record before it, that petitioner's claim here fails because, although petitioner has pointed out numerous errors and omissions in the tapes and transcripts, he has not identified any errors or omissions which are materially prejudicial to him."

Second, Benson claimed that his statements to Bolts, Hobson, and Dr. Gordon were involuntary.  The district court noted that the California Supreme Court had found that (1) Bolts's statement (no death penalty) did not constitute a promise of leniency, (2) Hobson's following statement effectively countered the death penalty statement, (3) Benson's testimony that Bolts's comment induced him to confess lacked credibility, and (4) Benson's true motivation for confessing was "a compunction arising from of his own conscience."  Based on its review of the record, the district court held that these findings were "reasonable in light of the evidence presented in state court," and were entitled to a presumption of correctness under § 2254(e)(1).  The court

further found that Benson "[had] failed to rebut these factual findings with any evidence at all, let alone evidence that is 'clear and convincing.'"  The court concluded:

> All of this evidence supports the California Supreme Court's finding that police coercion played no role in causing petitioner to make his statements to Detective Bolts and Investigator Hobson on January 9 and 13, 1986, or his statements to Dr. Gordon on January 10 and 12, 1986.  This court "cannot conclude that there is no possibility that fairminded jurists could agree with the state court's interpretation" of the record on this issue.

Third, Benson asserted that his waiver of his *Miranda* rights was not voluntary, knowing, and intelligent.  In rejecting this argument, the district court noted it was undisputed that Benson had been read his *Miranda* rights before the interviews and had agreed to speak.  The court further reasoned that the California Supreme Court could reasonably have concluded that Benson's waivers of his *Miranda* rights were motivated by the same "compunction arising from his own conscience."  The district court concluded that the California Supreme Court could reasonably have concluded that Benson's waivers were voluntary, knowing, and intelligent, particularly as Benson "acknowledged that he understood his rights and expressly stated that he waived them," and "demonstrated during the interviews that he had extensive, prior experience with law enforcement."

Although Benson claimed his waivers were not knowing due to his mental condition and incompetence, the district court noted that none of his "experts' declarations include an opinion that petitioner's waiver of *Miranda* rights was not knowing or intelligent due to his mental condition or that he was incompetent to waive those rights." Accordingly, the California Supreme Court could reasonably have concluded that Benson's proffer of "conclusory evidence was insufficient to establish a prima facie case that his waiver of *Miranda* rights was not knowing or intelligent."

Fourth, Benson argued that the seven-day delay between his arrest and his arraignment violated his Fourth Amendment rights as set forth in *McLaughlin*, 500 U.S. at 57, as well as his rights to due process and counsel. He argued that the delay tainted his confessions. The district court rejected this claim and ruled that because Benson had been subject to a parole hold, no clearly established federal law required compliance with the 48-hour time frame set forth in *McLaughlin*. Recognizing that there was no copy of the parole hold in Benson's file, the district court, nonetheless, credited the 2002 deposition of Benson's parole officer that he had placed a parole hold on Benson.[13]

---

[13] The district court commented:

> [T]here is no affirmative evidence demonstrating that Martel failed to place a parole hold on petitioner; in fact, all of the affirmative evidence supports the conclusion that Martel did place the parole hold when he testified he did. The only "evidence" to which petitioner points in support of the contrary contention is the absence of a document from a file where it should appear and Martel's lack of an explanation for the document's absence. This is insufficient to justify the

## B. Incompetence

The district court also rejected Benson's claim of incompetence. The district court concluded that Benson's "claim he was actually incompetent to stand trial does not survive review under [28] U.S.C. § 2254(d), and must be DENIED. The full record establishes that he was unusually focused and responsive, and was acutely aware of the proceedings."

## C. Ineffective Assistance of Counsel (IAC) at the Penalty Phase

### 1. *Benson's Childhood*

In its memorandum order the district court reviewed the relevant filings and then described Benson's childhood. He was the fourth child in a family of six boys and a girl. His mother was a drug addict, and both she and his father were alcoholics. Benson and his brothers were sent to live on a farm near Petaluma with a foster mother, Marjorie Buchanan. Life on the farm was represented at trial as relatively normal, aside from the fact that the boys seldom saw their natural parents. When Benson was nine years old, his father obtained physical custody over him, and Benson and his brothers went to live with his father and a stepmother in a motel in Long

---

further delay of this action that granting a stay under *Gonzalez* [*v. Wong*, 667 F.3d 965 (9th Cir. 2011)] would entail. Also weighing against the grant of a stay is the fact that petitioner has apparently made no effort until now to present the alleged new evidence to the California Supreme Court even though he has had the deposition transcript where the "evidence" appears since 2002.

Beach. Within weeks the family was evicted, and for the next three years they lived "in seedy, skid row hotels, houses, apartments and shanties, including a converted chicken coop, never staying in any one place more than a few months or the time it took for the manager or landlord to realize that no rent was forthcoming." The father, a chronic alcoholic, was always unemployed and looking for money. The boys continually attended different schools, and worked at whatever odd jobs they could find.

The district court noted:

> The county protective services agency sometimes intervened to remove the Benson children from their father's custody and place them in various foster and group homes. Off and on, the boys were reunited with their father, only to be repeatedly split up and placed in foster and group homes again. Finally when petitioner was 11 or 12, after three years of sporadically living with their father, the children were permanently taken from their father, and they were never together again as a family. All of the boys turned to alcohol to escape from reality, but Sandy [the daughter] did not.

Benson lived in group homes and institutions from age 11 onward and had difficulty adjusting to society. He began drinking alcohol and using marijuana at age 15. He was arrested a number of times for drunk driving and began using amphetamines and barbiturates around age 18. He went to junior high school in Los Angeles, and although he missed the last three weeks of school because he was placed in

juvenile hall, all of his grades were passing and some were excellent. He told a school counselor that no one cared, no one believed him, he wanted to be with his brothers and sisters, and it was all his parents' fault.

Benson was first arrested at age 10, and was first committed to the California Youth Authority (CYA) at age 13. He was removed from one foster home after he engaged in sexual activity with a younger female there. The district court further noted that Benson also had molested a four-year-old girl, but it was not reported to the authorities, he had a number of window-peeping charges, and he was a pedophile from age 14.

Between June 1967, when he was released from the CYA, and his arrest in 1971, Benson had 13 run-ins with the law and spent a year in custody. After his 1972 conviction, Benson was confined at Atascadero State Hospital until 1974. Due to his criminal activity and convictions, Benson was out of custody for less than a year between 1975 and 1985.

## 2. *Denial of Relief on IAC*

The district court noted that trial counsel's strategy at the penalty stage had been to argue that Benson "was a 'normal' little boy on the Buchanans' Petaluma farm, who was not born evil, but was a poor child taken from a normal life at the ranch and exposed to severe deprivation when his father took him and his brothers away from the ranch." The court then reviewed the mitigating evidence that Benson contends should have been presented including his predisposition to mental illness, exposure to alcohol in his mother's womb, the physical, sexual, and psychological abuse inflicted on Benson

by the Buchanans, and his numerous serious and longstanding mental deficiencies.

The district court nonetheless denied relief on Benson's IAC claim, reasoning:

> Having before it, as it did, petitioner's complete social history and the psychiatric diagnoses of Drs. Able [sic] and Foster, the California Supreme Court could reasonably have concluded that the additional information provided in connection with petitioner's first state habeas petition would have been insufficient to establish a reasonable probability that at least one juror would be persuaded to sentence petitioner to life without parole instead of the death penalty. Although petitioner's current account of his history is sordid and awful, his crimes were heinous, and the aggravating evidence presented by the prosecution was also sordid. The state court could reasonably have concluded that presenting petitioner as a normal little boy who was removed from a nurturing environment on the Buchanan farm and exposed to severe deprivation while living with his father might have benefitted petitioner, and that such a person would be more worthy of sympathy and a life sentence than someone who was environmentally and genetically damaged beyond rehabilitation from the beginning.

The district court distinguished the then-most-recent Ninth Circuit case, *Stankewitz v. Wong*, 698 F.3d 1163 (9th Cir. 2012). The court noted that unlike counsel in *Stankewitz*, Benson's counsel did present mitigating evidence,[14] and that Benson had "committed four murders which, however callous, were far from impulsive." The district court concluded that Benson's claim of IAC at the penalty stage "[did] not survive review under AEDPA."

## IV. Discussion

On appeal, Benson challenges four aspects of the district court's 373-page decision. The two certified issues are: (1) whether Benson's statements to the officers and Dr. Gordon should have been suppressed, and (2) whether Benson's counsel was ineffective at the penalty phase

---

[14] The court noted that the evidence included:

(1) that his mother was a prostitute and drug addict and his father an alcoholic; (2) that he was placed into foster care almost immediately after birth; (3) that his natural mother visited him only once during the first eight years of his life; (4) that upon reaching the age nine, his father obtained physical custody and within a few weeks of that Petitioner was forced to endure a years-long travail of bouncing around skid row hotels, shanties (including a chicken coop) and different schools; (5) that he experienced chronic hunger (he was forced to steal food); (6) that he was subjected to periodic placements into foster and group homes; (7) that petitioner and his several brothers all turned to alcohol; and (8) that he was first arrested at age 10, spent 4 of the 7 years between age 13 and 20 in the custody of the California Youth Authority, started using drugs at age 15, and between 1975 and 1985 was out of prison for a total of less than one year.

because he failed to investigate and present evidence of Benson's "severe physical, sexual and emotional abuse in early childhood at the hands of a foster family." Benson also raises two uncertified issues: (3) whether trial counsel was ineffective at the guilt stage in failing to impeach the state's case, and (4) whether the prosecutor withheld material and exculpatory evidence.[15]

## A. Standard of Review

As the district court noted, and Benson concedes, his federal habeas petition is reviewed under AEDPA, 28 U.S.C. § 2254. *Woodford,* 538 U.S. at 210 ("Because respondent's federal habeas corpus application was not filed until after AEDPA's effective date, that application is subject to AEDPA's amendments."). Accordingly, we can grant relief only upon a showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). The Supreme Court has directed that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), and that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101. Moreover, even "[w]here a state

---

[15] We requested and received a responding brief from California. *See* 9th Cir. R. 22-1(f). We then accepted Benson's oversized reply brief. We now issue a Certificate of Appealability for these two issues and consider the merits of Benson's contentions. *See Buck v. Davis*, 137 S. Ct. 759, 773–74 (2017).

court's decision is unaccompanied by an explanation, the
habeas petitioner's burden still must be met by showing there
was no reasonable basis for the state court to deny relief." *Id*.
at 98.

## B.  Benson's Statements were Properly Admitted

The record shows, and Benson admits, that he was
advised of his *Miranda* rights prior to each of his police
interviews and he indicated that he understood those rights
and waived them.  Nonetheless, Benson argues his statements
should not have been admitted because: (1) his confession
was tainted because he was not presented with the probable
cause which supported his arrest within 48 hours as required
by *McLaughlin*, 500 U.S. 44; (2) his statements were not
voluntary because he relied on the officer's statement that
there was no death penalty and the interrogations were
coercive; and (3) he has mental impairments which were
exacerbated by his use of drugs, necessitating the suppression
of his confessions. None of Benson's arguments merit relief.[16]

---

[16] Benson also appears to advance as a separate argument that it was
clear error and an abuse of discretion for the district court not to hold an
evidentiary hearing.  This argument fails in light of the Supreme Court
direction in *Pinholster*, 563 U.S. 170, that review under 28 U.S.C.
§ 2254(d)(1) is limited to the record in existence before the state court. *Id*.
at 181. Our review of the record shows that the district court considered
Benson's evidence of mental impairment, was aware of the allegations
concerning the interrogation procedures, and rejected Benson's
*McLaughlin* claim.  Thus, it appears that all of Benson's factual and legal
allegations that were before the state courts were also before the district
court, and we perceive no factual issue that required the district court to
hold an evidentiary hearing.  Benson has not carried his burden of
showing that he was denied due process by the district court declining to
hold an evidentiary hearing.

1.  *Benson is not entitled to any relief under McLaughlin*

    a.  *Because a parole hold was put in place,* McLaughlin *does not apply*.

Benson gave multiple detailed confessions regarding the murders. However, each of the confessions was made during the period of time between Benson's arrest for kidnapping on January 7, 1986 and January 14, 1986, when he was arraigned and presented with the probable cause for his arrest for the first time. The Supreme Court ruled in *County of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991) that an arrestee is entitled under the Fourth Amendment to a hearing at which he is presented with the probable cause of his arrest within forty-eight hours of the arrest. Benson argues that his confessions were tainted due to the delay in his arraignment.

Benson raised his *McLaughlin* claim in his third state habeas petition, which was denied by the California Supreme Court on February 28, 2001. Accordingly, he is entitled to relief on this claim only if "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

A Fourth Amendment claim resulting from a *McLaughlin* violation would be cognizable on habeas corpus review. *Anderson v. Calderon*, 232 F.3d 1053, 1071–72 (9th Cir. 2000), *overruled in part on other grounds by Bittaker v. Woodford*, 331 F.3d 715, 728 (9th Cir. 2003). However, the State argues that the 48-hour rule described in *McLaughlin* does not apply to the Fourth Amendment rights of a parolee who is held pursuant to a "parole hold." Generally, a parole hold authorizes a person suspected of violating his parole to be detained while authorities investigate the alleged parole violation. As we have already noted, Benson's parole officer,

Felix Martel, placed a parole hold on Benson immediately after Benson's arrest for the kidnaping.

Benson argues that evidence gathered since his trial calls into question whether a parole hold was, in fact, put in place. In particular, he asserts that as early as 2002, in connection with his third state habeas petition, the actual paper parole hold could not be located. However, Benson's parole officer Martel testified at the initial suppression hearing in June 1986, and at his deposition on May, 2002, that he had placed a parole hold on Benson on Wednesday, January 8, 1986.

Although the district court accepted the 2002 deposition of Benson's parole officer, the information in the deposition is not properly before us. *See* 28 U.S.C. § 2254(d)(2) (making clear that a writ of habeas corpus will not be granted unless the State court's adjudication on the merits "resulted in a decision that was based on an unreasonable determination of the facts *in light of the evidence presented in the State court* proceeding") (emphasis added). We have held that *Pinholster* prohibits consideration of new evidence "for the purpose of determining whether the last reasoned state court decision was contrary to or an unreasonable application of clearly established law or an unreasonable determination of the facts." *Crittenden v. Chappell*, 804 F.3d 998, 1010 (9th Cir. 2015). In other words, new evidence may not be used to determine whether the California Supreme Court's decision was an unreasonable determination of the facts before it. Accordingly, we are precluded from considering the evidence.[17]

---

[17] In any event the newly proffered evidence does not raise a material issue of fact. All the affirmative evidence in Benson's state court proceedings shows that a parole hold was placed on Benson on

The existence of a parole hold obviated the Fourth Amendment requirement that Benson be arraigned within 48 hours. In *Morrissey v. Brewer*, 408 U.S. 471, 483 (1972), the Supreme Court noted that "the State has an overwhelming interest in being able to return the individual [on parole] to imprisonment without the burden of a new adversary criminal trial," commended a two stage process,[18] and recognized that there is "typically a substantial time lag between the arrest and the eventual determination by the parole board whether parole should be revoked." *Id.* at 485. In *Pierre v. Washington State Board of Prison Terms and Parole*, 699 F.2d 471, 473 (9th Cir. 1983), we upheld a preliminary probable cause determination held 21 days after parole was suspended. Moreover, the California Supreme Court has declined to require a probable cause hearing for a parolee within ten days of arrest. *People v. DeLeon*, 399 P.3d 13 ,26 (Cal. 2017). *McLaughlin* therefore does not apply to Benson's situation, and there is no clearly established law that a parolee subject to a parole hold must be presented with the probable cause within 48 hours of his arrest.

---

Wednesday, January 8, 1986. Indeed, multiple documents that were produced at the 2002 deposition confirm the parole hold. For example, both an incident report written by Benson's parole officer and a teletype message sent to the sheriff's office attest to the placing of a parole hold on Benson. Benson's presentation does not come near showing that the California Supreme Court's denial of relief was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2).

[18] The Supreme Court explained: "The first stage occurs when the parolee is arrested and detained, usually at the direction of his parole officer. The second occurs when parole is formally revoked." 408 U.S. at 485.

    b. *Even if* McLaughlin *applied, Benson's confessions would not be suppressed*.

In *Anderson*, 232 F.3d at 1071, we held that the appropriate remedy for a *McLaughlin* violation "is the exclusion of the evidence in question—*if* it was 'fruit of the poisonous tree.'" We noted that this test "ensures that courts will not suppress evidence causally unrelated to the Fourth Amendment violation," and "protects the arraignment right in question by barring any exploitation of the delay that causally produces a statement." *Id*.

Here, Benson was detained late at night on Tuesday, January 7, 1986, and he voluntarily confessed to the murders and sexual assaults in disturbing and graphic detail to the officers on January 9, 1986, within 48 hours of his detention. Thus, the "delay" of his arraignment until Monday, January 13, in no way created or influenced his first confession.

In addition, Benson's assertion that the delay in his arraignment was specifically to deny him counsel and thus violated his Sixth Amendment right to counsel is not meritorious. Benson suggests that because his name was on the lists of individuals to be taken to court for arraignment on January 8, 9, and 10, and he was taken to the court on Friday, January 10, but not arraigned, he was held for an improper purpose. However, Officer Bolts explained that the "daily prisoner transportation list" was created every morning by the booking clerk and included the names of all those in custody who have not yet appeared in court. Officer Bolts indicated that Benson was transported to the court on Friday, January 10 and not arraigned, but did not know why. There is no evidence in the record that the delay in arraignment was designed to frustrate or prevent the provision of counsel. We

need not inquire further into the reasons for Benson not being arraigned on Friday in terms of abridging his Fourth Amendment rights because it is not causally related to his prior confessions.  Furthermore, as Benson points to no case law indicating that a failure to arraign an individual within 48 hours represents a per se violation of that individual's Sixth Amendment right to counsel, there is no clearly established law which compels a contrary result.

2. *The California Supreme Court reasonably concluded that Benson's confessions were voluntary*

Benson asserts that the confessions he made to Bolts and Hobson were not "voluntary," and that the state court's determinations that they were voluntary represented an unreasonable determination of the facts.  In his opening brief, Benson claims that the "officers' plan was to make Mr. Benson believe they were dealing with him, but to not do so – the exact type of 'trickery' that is impermissible when leading one to believe in an inducement."

The trial court held a suppression hearing regarding Benson's confessions, and the California Supreme Court upheld the trial court's decision not to suppress the confessions.  Before us Benson makes two arguments regarding the voluntariness of the confessions.  First, he argues that the confession was coerced because of Detective Bolts's incorrect statement that "there is no death penalty here."  Second, Benson argues that his mental defects prevented him from being able to confess voluntarily. The Supreme Court of California, after a review of the record, determined that Benson's confession was "voluntary beyond a reasonable doubt." *People v. Benson*, 802 P.3d at 345.

In denying the motion to suppress the statements, the trial court found that the police officers had not been coercive and that their statement regarding the death penalty did not function as an inducement. The trial court described the interview as "totally aboveboard," and noted that there was "no mention of the degree of any charge pending . . . [or] an implied promise of a reduced charge." The trial court further found that there had been no false promises. It found that there was no deception, as "there's no suggestion of different treatment if Mr. Benson chose to make any confessions or admissions" and no "implied promise of leniency." The trial court concluded that "Mr. Benson's statements were not coerced . . . but rather were made freely and voluntarily."

The California Supreme Court, upon a full review of the record, agreed and found that there was "[n]o coercion, no harassment. To the contrary, [the police interview] was strangely cordial and somewhat light, and not at all heavy-handed in the approach that was taken." *Benson*, 802 P.3d at 344. The California Supreme Court also noted that there was a "not insubstantial" period of time between Detective Bolts's statement about the death penalty and Benson's ultimate confession, and that Benson's statement "it doesn't matter" in response to Bolts's comment "practically compels the inference that insofar as the confessions were concerned, the comment in fact 'didn't matter.'" *Id*. at 345.

In the case of a coerced confession, we have observed that the "pivotal question . . . is whether the defendant's will was overborne when the defendant confessed." *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993). The California Supreme Court was presented with evidence that Benson understood the questions being asked of him and volunteered a confession. Benson stated that the existence of a death

penalty "didn't matter" and the interrogation was not coercive. Benson testified that his "primary thought was nothing was going to change the effect of the people that died. Nothing was going to bring them back." He noted that there was "no one answer" to explain why he decided to confess, and he indicated on several occasions that he felt relieved by admitting his actions. The California Supreme Court's conclusion that Benson's will was not overborne by the misstatement about the law regarding the death penalty in California was neither "an unreasonable application, of clearly established Federal law, as determined by the Supreme Court of the United States," nor "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).[19]

3. *Benson has not shown that his mental condition rendered his confession involuntary*

Benson claims that he "suffers from diffuse organic brain damage and frontal lobe damage which severely affects his mental functioning." He contends that these impairments "create irrational belief systems and behavior," and deny him "the capacity to recall accurately the events that he recounted." He argues that the California Supreme Court, in denying this claim, "unreasonably determined the facts, and unreasonably applied Supreme Court precedent."

---

[19] Benson's argument that his confession to Dr. Gordon should have been suppressed because he was misled by Dr. Gordon, or confused, also fails because it is not compelled by the evidence. Benson admits that Dr. Gordon properly introduced himself and advised him of his *Miranda* rights. Thus, even if Benson was confused as to the purpose of Dr. Gordon's visit, this was not Dr. Gordon's or the state's fault.

Benson raised this argument in his first habeas petition, which the California Supreme Court, on May 12, 1994, denied on the merits without further explanation. We review the record to determine whether "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

Benson has not met this standard. The district court carefully reviewed the evidence of Benson's behavior during pretrial proceedings and at trial, concluded that Benson "was unusually focused and responsive, and was acutely aware of the proceedings." This determination is a fair reading of the record of the state court proceedings. Benson was verbose and elaborate in his confession providing excruciating descriptions of how he molested the children and eventually killed them. He did not simply agree to suggestions from the police officers. Although Benson began his interview by dissembling, after becoming caught in lies, he made detailed confessions. Indeed, during the hearing on the motion to suppress, Benson's trial attorney did not argue that Benson's psychological state made him incapable of rendering a voluntary confession.[20] Further, none of the experts presented to the California Supreme Court in Benson's habeas filings specifically opined that Benson's neurological defects made

---

[20] The district court noted in reviewing Benson's participation in the initial phases of his trial:

> These passages make it clear petitioner was well-aware of the nature of the proceedings against him. Significantly, in argument on the motion to suppress, petitioner's attorney made no argument that petitioner was incompetent to render a voluntary confession, nor did counsel suggest a doubt existed as to petitioner's competence to proceed with the hearing or with trial.

it likely that his confessions were false or otherwise made Benson incapable of truthfully inculpating himself in a confession.

We agree with the district court that it was reasonable for the California Supreme Court to conclude that Benson was aware of the nature of the proceedings against him, and that he understood the consequences of his statements to the officers.

## C. Trial Counsel Was Not Ineffective at the Penalty Phase

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth the now well-established two-prong test for ineffective assistance of counsel.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*. at 687.

In addition to setting forth the *Strickland* two-prong test, the Supreme Court has further directed that where a federal habeas petitioner challenges his state trial counsel's performance, the question in federal court "'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Thus, our review of the state court decision on ineffective assistance of counsel is "doubly deferential." *Pinholster*, 563 U.S. at 190 (quoting *Knowles*, 556 U.S. at 123).

The Supreme Court emphasized that federal courts should defer to the state court's decision. "Pinholster must demonstrate that it was necessarily unreasonable for the California Supreme Court to conclude: (1) that he had not overcome the strong presumption of competence; and (2) that he had failed to undermine confidence in the jury's sentence of death." 563 U.S. at 190. The Court further commented on the deference due counsel who "confronted a challenging penalty phase with an unsympathetic client," and held that we, the Ninth Circuit, had "misapplied *Strickland* and overlooked 'the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions.'" *Pinholster*, 563 U.S. at 193, 195 (citing *Strickland*, 466 U.S. at 689).

Accordingly, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

1.  *The record does not compel a finding that counsel was ineffective*

Benson argues that trial counsel was ineffective in failing to investigate and then present evidence of the physical, mental, and sexual abuse Benson endured at the Buchanan ranch.  He also claims that counsel should have investigated whether he had an organic brain injury.

a.  *Counsel's "failure" to investigate further Benson's childhood.*

The strategy at trial was to humanize Benson, and to point to at least one moment in time when Benson appeared happy, normal, and relatable.   Benson's counsel presented a photograph of Benson on the Buchanan farm: Benson was nine years old, smiling, and bottle-feeding a calf.  Defense counsel then asked the question, "How did a little boy who got from – that darling little boy in that photograph with the bottle of milk feeding the calf – one wonders how did he get from there to where we are today?" Counsel then described the relative deprivation Benson experienced.  Mitigating evidence was presented that (1) Benson's mother was a prostitute and father an alcoholic; (2) he was placed into a foster home immediately after birth; (3) there was hope for a nice life due to his time on the Buchanan farm; (4) Benson was ripped from the farm at age nine, and within weeks was forced to endure a years-long travail of bouncing around seedy hotels, shanties (including a chicken coop) and different schools; (5) Benson experienced chronic hunger; (6) Benson was placed periodically in other foster homes; (7) Benson and his brothers turned to alcohol and drugs; (8) Benson was first arrested at age 10 and between 13 and 20 was in and out of custody; (9) Benson was diagnosed with

"early-onset pedophilia," which made it difficult for him to conform his behavior to social norms; and (10) Benson had mental impairment due to drug use.

Benson now contends that the strategy used by Benson's trial counsel was deficient. He proffers evidence that life on the Buchanan farm was far from idyllic. Evidence has come to light indicating that Marjorie Buchanan beat Benson with a rubber hose, willow tree branches, a belt, and a large shovel. She held Benson's hand to the stove, and punished him by filling his mouth with cayenne pepper. She gave the boys enemas of hot, soapy water. Her adult son would routinely sexually abuse Benson and his brothers, and forced Benson to do unnatural acts with animals. According to Benson's brother Bill, "[i]t happened so much that we all thought it was normal." The abuse allegedly led to strange behavior: Benson would bang his head against the wall and eat dirt, live bugs, and beetles. Benson was also hit on the head repeatedly as a child and at one point nearly drowned. To deal with the abuse, the Benson brothers abused various substances, including drinking cough syrup and sniffing glue to the point of hallucinations. Dr. Jonathan Pincus who examined Benson well after the trial, determined that Benson evinces signs indicative of brain damage.

Benson argues that counsel should have been on notice to investigate his time on the Buchanan farm. He points to a February 1994 declaration by Dorothy Ballew, a private investigator and the defense investigator for Benson in 1986–87. She stated that: (a) she was the only person on the defense team to meet regularly with Benson; (b) she "realized early on that many of his memories, especially of his childhood, were inaccurate and incomplete"; (c) she suspected trauma in Benson's past; and (d) she had

"requested trial counsel's assistance in pursuing specific avenues of investigation and was met with no response or was rebuffed." Ballew asserted that she told trial counsel that there "were several extremely important investigative tasks that needed to be completed before commencing [the] penalty phase," but counsel did not request a continuance. Ballew further asserted that when she interviewed Brad Benson, "immediately after the penalty phase had begun," he told her that Marjorie Buchanan disciplined him and his brothers "by putting red pepper in their mouths and beating them with a rubber hose," and that from the age of nine to twelve, he (Brad) "was routinely sodomized by his older foster brother, David Buchanan." Ballew reported what Brad had told her to trial counsel but he declined to request a continuance of the penalty phase.

Benson also points to a December 1992 declaration by Terry Kellogg, "a family systems therapist and Certified Chemical Dependency Practitioner." Kellogg stated that he was contacted by Ballew in early 1987 and was retained by trial counsel as an expert to testify at trial. Kellogg traveled to Santa Barbara in March 1987 to consult with trial counsel. He informed counsel that he "was quite certain that Mr. Benson had suffered significant physical and/or sexual abuse in his formative years and advised him that further investigation of Mr. Benson's childhood was necessary if the jury was to be provided an accurate picture of Mr. Benson's mental state at the time of the crimes." Kellogg asked counsel for an opportunity to meet with Benson, but counsel denied the request, and seemed to ignore Kellogg's suggestions.

Reasonable minds could conclude that Benson's trial counsel's decision not to investigate Benson's life on the

farm further was reasonable. Benson himself did not recall
the abuses he endured at the Buchanan ranch. Indeed,
Benson's first habeas petition to the California Supreme
Court noted that Benson "[had] no memory of the torture, and
sexual, psychological and emotional abuse he suffered on the
Petaluma farm." Dr. Gordon testified that Benson told him
that "until [Benson] was nine and a half years of age in that
first foster home (the Buchanan ranch), he had the nicest life
he has ever known." Testimony from Benson's siblings
corroborated Dr. Gordon's report about Benson's life on the
farm. Brad testified that he and his siblings were "displaced
from the farm" after their father won custody. Brad then
described his father's alcoholism, the difficulties the family
experienced after their time on the farm, and his own
alcoholism. He further testified that when at age 15 he left a
home for boys where he was temporarily placed, "the only
thing . . . . I could think of was to return to the farm, to the
only woman that cared about me . . . Marjorie Buchanan."[21]

Benson has provided no evidence that trial counsel was
informed that Benson was seriously abused at the Buchanan
ranch. The only mistreatment at the Buchanan ranch that trial
counsel appears to have been aware of was that Marjorie
Buchanan had disciplined the Benson boys with red pepper
and a rubber hose. The California Supreme Court could
reasonably have decided that such disciplinary measures did
not put trial counsel on notice that Benson had been tortured
during his stay on the Buchanan ranch, especially given the

---

[21] According to Ballew's declaration, when she spoke to Brad after
the penalty phase had begun, Brad mentioned that he had been sodomized
by David Buchanan, but apparently did not state that Benson also had
been sodomized.

countervailing evidence which indicated that his time at the ranch was positive.

Furthermore, counsel had a reasonable explanation for Benson's aberrant behavior – Benson's traumatic experiences living with his alcoholic father after the age of nine. Thus, with no suggestion from either Benson or his siblings that Benson suffered trauma on the Buchanan ranch, counsel cannot be faulted for not investigating a suspicion of suppressed past trauma. Reasonable minds could conclude that competent trial counsel would not have investigated Benson's treatment during his two-to-three-year stay at the Buchanan ranch.[22]

This is not an instance in which trial counsel did not proffer a defense at the penalty stage. Counsel called two of Benson's brothers and his sister to establish that they all had endured horrible childhoods. Counsel called a retired high school principal to testify that in junior high school Benson was capable but misunderstood. Counsel called Benson's uncle and a social worker to testify that Benson's father was a secretive, unreliable alcoholic who refused to address his alcoholism. Counsel called a pharmacist who testified that Benson was "very very paranoid" and that his judgment was compromised by his addiction to methamphetamine. Several months before trial, counsel retained Dr. Abel who testified that Benson had a number of psychiatric disorders, including

---

[22] Although the defense investigator and the family systems therapist stated in 1992 and 1994 that, in 1986, they thought "that Mr. Benson had suffered significant physical and/or sexual abuse in his formative years," it does not appear that they focused on Benson's two-and-a-half year stay at the Buchanan ranch. In light of Benson's and Brad's favorable testimony in 1986 concerning the Buchanan Ranch, there was little reason for trial counsel to investigate that period of Benson's troubling childhood.

paraphilia, that he had a drug dependency, and that he generally did not need to kill. Counsel even recalled one of the officers to support the argument that Benson was addicted to methamphetamine at the time of the murder. In sum, trial counsel presented a cogent theory supported by the testimony of several witnesses against the imposition of the death penalty

This defense, although unsuccessful, was a reasonable strategy. Portraying Benson as a normal boy until he was nine or ten seems just as likely, perhaps more likely, to tug on the heart-strings of the jury as explaining that mental health problems ran in Benson's family and that he was mistreated all his life rather than after he was nine and a half years old. Indeed, the suggestion that Benson's perversion was a result of a traumatic period in his childhood allowed for the possibility that he could change, that he could reform. Arguing that Benson's depravity emanated from sexual and physical abuse throughout the entirety of his childhood, while perhaps reducing a perception of his responsibility for his actions, might also make it appear less likely that Benson could change. This was a material concern in light of the admitted evidence of Benson's multiple prior abductions of children. In addition, this approach would be slightly inconsistent with counsel's argument, through Dr. Abel, that Benson did not need to kill and could conform his behavior to acceptable standards if incarcerated for life.

Benson's counsel's efforts are clearly distinguishable from those cases in which defense counsel have been found ineffective at the penalty stage. *See Rompilla v. Beard*, 545 U.S. 374, 389 (2005) ("It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when

the file is sitting in the trial courthouse, open for the asking."); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (holding that "[c]ounsel's decision not to expand their investigation beyond [the pre-sentence report] fell short of the professional standard that prevailed in 1989"); *Porter v. McCollum*, 558 U.S. 30, 39–40 (2009) (per curiam) (holding that counsel's failure to investigate any evidence of Porter's mental impairment, family background, or military service was not a reasonable professional judgment). Similarly, in *Stankewitz v. Wong*, 698 F.3d 1163, 1166 (9th Cir. 2012), relief was based, in part, on counsel's failure to hire "an investigator or interview[ ] Stankewitz's teachers, foster parents, psychiatrists, psychologists or anyone else who may have examined or spent significant time with him during his childhood and youth." *Id*. at 1171 (internal quotation marks and citations omitted).

Benson's trial counsel in 1986 investigated Benson's background and put on a comprehensive defense to the death penalty. Perhaps different trial counsel might have employed different tactics, but on this record we agree with the district court that the "California Supreme Court could reasonably have concluded that 'the egregious nature of [Benson's] offenses' and the sordid nature of the other evidence the prosecution proffered in aggravation were sufficient to 'overcome any alleged prejudice resulting from counsel's 'failure' to introduce mitigating evidence.'"

> b. *Counsel's failure to investigate organic brain injury*.

Benson also argues that his counsel was ineffective because he did not investigate whether Benson suffered from an organic brain injury. He points to a declaration by Terry

Kellogg, the "family systems therapist" retained by Benson's attorneys, who stated that he advised Benson's counsel to look for symptoms of serious head injuries. Benson contends that the neurological impairments were apparent because he had difficulty in school, and his problems with concentration and attention were "apparent to teachers, social workers and probation officers." Benson asserts that his neurological impairment has been confirmed by subsequent testing: Dr. Jonathan Pincus, a neurologist, stated in a declaration dated January 7, 1993, that testing has confirmed that Benson has organic brain injury.

Benson objects that "the jury never knew . . . that [he] suffers from frontal and temporal lobe impairment [or] corresponding neurological impairment." Benson further argues that the mitigating evidence which his trial counsel failed to present is "explanatory mitigation . . . . [it] does precisely what trial counsel in this case admitted he cannot do – it explains crimes." According to Dr. Pincus, Benson's "neurological damage in combination with the extreme abuse and sexual abuse to which [he] was subjected as a child were the cause of [his] bizarre sexual impulses. With the brain damage he sustained after birth, [his] ability to control these impulses is severely compromised and non-existent at times."

However, the California Supreme Court could have concluded that trial counsel was not on notice of organic brain injury, and therefore not required to investigate it. The only possible evidence of organic brain injury which was known to Benson's trial counsel was that (1) Benson had trouble in school, and (2) a statement by Kellogg to the effect

that counsel should look for a history of head injuries.[23]   But Benson's trial counsel had employed the aid of a mental health expert, Dr. Gene Abel, a board certified psychiatrist. According to his trial testimony, Dr. Abel examined approximately 280 "pages of information regarding various evaluations that [Benson] has had," and met with Benson for approximately twelve to thirteen hours.  Dr. Abel also administered "a variety of paper and pencil tests that he completed when [Dr. Abel] wasn't there talking with him." Dr. Abel testified that he received Benson's "medical records from Atascadero and various other institutions in California as part of [his] preparation for examining [Benson]." Dr. Abel diagnosed Benson with pedophilia and serious drug dependency.  He explained that Benson's pedophilia should have been treated with hormonal injections but was not. Dr. Abel explained that these disorders made it difficult for Benson to conform his conduct to the requirements of the law.   Dr. Abel did not diagnose Benson with having experienced severe head trauma.[24]

---

[23] Kellogg's declaration does not indicate his education.  He describes himself as a "family systems therapist and Certified Chemical Dependency Practitioner."   He asserts that over the past 23 years he had "treated literally thousands of patients, including hundreds of people convicted of sex offenses," has "created and consulted for sexual offender treatment programs throughout the country," and "lectured extensively at continuing education seminars for mental health professionals."   The record does not indicate that he is a neurologist, psychologist, or any other kind of board certified professional.

[24] In his 1992 declaration, Dr. Abel explained that after interviewing Benson in 1986, he diagnosed Benson with depression.  However, he did not state in that affidavit that, after interviewing Benson in 1986, he suspected that Benson had experienced organic brain injury.

Accordingly, trial counsel was not on notice that further examination of Benson with the specific goal to uncover organic brain injury was necessary. This was not a case where counsel failed to have the defendant examined by a psychological professional. Quite the opposite. The psychological professional who examined Benson, Dr. Abel, testified for the defense, diagnosed Benson with a medical disorder, and did not opine that Benson suffered a brain injury. Indeed, trial counsel reported to Benson's state habeas counsel that "the mental health professionals . . . retained for Mr. Benson's trial did not report that Mr. Benson suffered from organic brain damage," and noted that had such brain damage been reported, he "'would have seized upon it' and would have used the information at trial."

The California Supreme Court could reasonably have concluded that counsel did what investigation was necessary in terms of organic brain injury. We are aware of no clearly established law that shows otherwise.

2. *The record does not compel a determination that counsel's performance, if ineffective, was prejudicial*

The ultimate step in determining whether counsel's deficient performance prejudiced the defendant at the penalty phase is reweighing the evidence in aggravation against the totality of the mitigating evidence in order to determine "whether there is a reasonable probability that absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also Sears v. Upton*, 561 U.S. 945, 956 (2010); *Wiggins*, 539 U.S. at 534. Reasonable probability is a level that "undermine[s] confidence in the outcome," *Strickland*, 466 U.S. at 694;

however, counsel's deficient performance is not prejudicial just because the court cannot "rule out" the possibility that the sentencer would have imposed a life sentence instead of the death penalty. *Wong v. Belmontes,* 558 U.S. 15, 20, 27 (2009). Rather, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693).

Here, the record fully supports the California Supreme Court's implicit determination that counsel's performance, even if it were deficient, did not prejudice Benson. *See Richter*, 562 U.S. at 98 (commenting "[a]s every Court of Appeals to consider the issue has recognized, determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning," and holding that "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief").

Benson's trial counsel presented the jury with evidence that Benson's aberrant behavior had been brought about by his horrendous childhood, that he was unable to control his pedophilia when he was high on amphetamines, and that he had taken methamphetamine during the weekend in issue. Thus, much of the proffered evidence offered in the post-conviction petition was cumulative. Benson's childhood was not just horrible after he was nine years old, but also horrible between the ages of seven and nine. His pedophilia was not just the consequence of an appalling childhood, but might be partially genetic or due to in utero trauma.

The proffered evidence in Benson's post-conviction petition included evidence of his sexual abuse while living at the Buchanan farm. We have recognized that "[c]hildhood sexual abuse can be powerful evidence in mitigation, particularly when it is not an isolated event." *Wharton v. Chappell*, 765 F.3d 953, 977 (9th Cir. 2014). Absent the considerable aggravating evidence, the proffered information, including evidence of sexual abuse, might have made Benson more sympathetic to the jury, but it also might have made him seem less likely to be rehabilitated. Furthermore, the information does not explain or justify Benson's murder of Laura and her three children, particularly as, according to Benson, she was willing to indulge his pedophilia.

Moreover, the evidence in aggravation was damning. The heinous nature of Benson's crimes was overwhelming: killing Laura, sexually abusing two little girls for a day before murdering them, and killing a two-year old boy because he cried (he could hardly have been a witness). In addition, Benson had four prior felony convictions over a ten-year period of time for abusing little girls, including two instances in which he had taken the girls from their bedrooms when they were sleeping. In this context, additional evidence of Benson's past abuse and possible genetic make up might not have assisted his attorneys' argument for a life sentence as the evidence tends to suggest that Benson was not able to, and never would be able to, control his pedophilia.

We do not fault the California Supreme Court for denying Benson's relief. To grant relief, we would have to conclude that the California Supreme Court's denial of relief was unreasonable. *Pinholster*, 563 U.S. at 190; *Knowles*, 556 U.S. at 123. But, on this record, in light of Benson's horrific crimes, past felony convictions, and the mitigating

evidence offered by trial counsel, we cannot conclude that there is no reasonable argument that the additional information would not have changed Benson's conviction or sentence. *See Richter*, 562 U.S. at 105.

Benson's argument with respect to his organic brain injury is similarly unavailing. According to Dr. Pincus, the brain damage from which Benson suffers could lead to difficulty in impulse control and rational thinking. But the crime, as Benson himself described it in his confession, was for the most part not "impulsive." Benson did not kill the Camargo family in a fit of rage. He killed Laura, and then, over the course of the next day, proceeded to molest the two daughters. He described killing the baby Sterling because he wanted to quiet him to avoid detection. Benson described hesitating before finally striking the killing blows on the two little girls. After it was all over he attempted to cover up his crime. He set the house on fire and fled. The crime was not "impulsive": it was deliberate, and took place over approximately thirty hours. Benson has not shown that evidence of neurological damage which gave rise to problems with "impulse control" would have significantly aided his showing for mitigation.

In sum, given the heinous nature of the crime and the mitigating evidence presented by trial counsel, we cannot conclude that it would have been unreasonable for the

California Supreme Court to determine that the alleged deficient performance of Benson's trial counsel at the penalty stage of his trial, did not prejudice Benson.[25]

## D. Benson Has Not Shown that Trial Counsel Was Ineffective at the Guilt Phase of the Trial

The first of Benson's newly certified claims is that trial counsel was ineffective at the guilt phase of the trial. Benson supports his claim with a smorgasbord of assertions. He argues that trial counsel should have: (1) further investigated the officers' conduct in soliciting his confession; (2) presented expert opinions raising factual questions as to the timing of Laura's death, whether Stephanie was alive when the fire began, and how Sterling died; (3) presented evidence that a test performed several days after the weekend revealed methamphetamine in Benson's urine; (4) obtained and presented evidence of the absence of semen on the girls, and that Laura may have been breathing at the time of the fire; (5) investigated whether Dr. Gordon had, in bad faith,

---

[25] The dissent, focusing on the abuses Benson suffered during his stay at the Buchanan Ranch, concludes that "no fair-minded judge objectively reviewing the unintroduced mitigating evidence . . . could conclude, *with confidence*, that the outcome would have been the same." Dissent at 82. We, of course, disagree. As noted, the jury was presented with evidence of Benson's horrendous childhood, much of it occurring after he left the Buchanan ranch, that Benson had multiple criminal convictions, including several for kidnapping young children, that he was unable to control his pedophilia when high on amphetamines, that he had taken amphetamines during the weekend at issue, and that his abhorrent actions over that weekend could not fairly be considered impulsive. Considering all the evidence, the California Supreme Court could reasonably determine, with confidence, that evidence that a portion of Benson's childhood was considerably more horrendous than initially presented would not have changed the outcome.

intentionally destroyed exculpatory evidence in a prior case and had previously concealed evidence in violation of a court order; and (6) investigated evidence that a witness had told police she was at the Camargo residence on Sunday and that Laura was alive. In addition, Benson argues that counsel should have further investigated his impairments that rendered his statements involuntary as that would have undermined the credibility of his confession and made it less likely that the jury would have convicted him or given him the death penalty.

1. *Benson has not shown that further investigation and presentation of evidence could have affected the conviction or sentence*

Benson's claim of ineffective assistance of counsel at the guilt phase cannot overcome the uncontroverted evidence that he arrived at the Camargo home on Saturday night when Laura and her children were alive, that nobody else was seen entering or leaving the home on Sunday, and that on Monday morning, when the home was found to be on fire and Laura and her children dead, Benson was not there. Moreover, Benson's heavy ring mandrel, which had been used to strike Laura and her daughters, was found at the scene, along with pornography on which Benson's fingerprints were found. Add to this Benson's confession to sexually abusing the girls and murdering Laura and her children, and trial counsel's decision to concentrate on the penalty phase of the trial was certainly reasonable.

The assertion that trial counsel should have further investigated the officers' conduct leading to Benson's confession is not well taken. The matters Benson now suggests deserve further investigation—the lack of the tape

recording for the first two hours of interrogation, Benson's nine hours of equivocation, and the officers' leading statements and questions —were all thoroughly considered in the litigation over the admission of Benson's confessions. Even if the officers had engaged in some improprieties—and there is nothing in the record to suggest they did—the improprieties would be insignificant in light of Benson's detailed, disturbing confessions.

Furthermore, in light of the physical evidence and Benson's confession, the actual sequence of events during the thirty hours that Benson was in the home is of little consequence. Even accepting that Benson's experts could raise questions as to the timing of Laura's death, whether Stephanie was alive when the fire began, and how Sterling died, those questions would not make Benson any less responsible for the murders and the sexual abuse of the girls. Indeed, such presentations may have led a jury to conclude that Laura and her children had suffered even more than as described in the state's case. Also, the contention that there was an absence of semen on one of the daughters is not particularly probative under these circumstances. Nor would these factors necessarily undermine Benson's narrative, which was full of contradictions and inconsistencies based on what he claimed he did, and did not, recall. Trial counsel may reasonably have determined that contesting the grisly details of the sexual abuse and murders, which would not have exonerated Benson, might have weighed against the jury sentencing him to life without the possibility of parole.

Even accepting that trial counsel did not obtain the lab report indicating methamphetamine in Benson's urine, and should have done so, Benson has failed to show that this deprived him of a fair trial. *Strickland*, 466 U.S. at 687. Trial

counsel presented evidence and argued that Benson was high on methamphetamine over the weekend, that methamphetamine compromised his ability to think and control his actions, and that the use of methamphetamine had a lingering effect. Indeed, the state did not really contest that Benson used methamphetamine. The lab report would have been cumulative evidence.

    2. *Trial counsel's alleged failure to investigate Dr. Gordon was not prejudicial*

In a different case involving child molestation in the Superior Court of San Luis Obispo, Dr. Gordon was found to have participated in the destruction of evidence and to have acted in bad faith.[26] Accepting that the revelation of Dr. Gordon's prior misconduct was important information which should have been turned over to the defense by the state, it does not follow that trial counsel was ineffective. Although the evidence would have impeached Dr. Gordon's credentials, it would not have been evidence that Dr. Gordon's testimony as to what Benson said, or even his impressions of Benson, were not sound. Critically, Benson had already confessed his sexual abuse and the murders to the officers before he met with Dr. Gordon and did so again after his meeting with Dr. Gordon. Attempting to impeach Dr. Gordon on the basis of his misconduct in an unrelated proceeding might have been difficult and of minimal value, suggesting that even if trial counsel should have discovered Dr. Gordon's judicial reprimand, the failure to do so was not prejudicial. Moreover, we are not aware of any case where

---

[26] The case was *People v. Nurss*, No. 13655 in the Superior Court of California for the County of San Luis Obispo. The superior court's order stating that Dr. Gordon acted in bad faith was entered on July 29, 1986.

counsel was deemed ineffective for failing to conduct a thorough analysis of each of the cases in which a proffered expert had previously testified. Benson has not shown that the state courts' refusal to entertain his ineffective assistance of counsel claim based on Dr. Gordon's alleged bias and incompetence was unreasonable.

3. *Benson's allegation that trial counsel failed to investigate the statement of a lay witness is not persuasive*

Benson's assertion that a witness had told the police that she was at the Camargo residence on Sunday and that Laura was alive is of little weight when placed in context. It appears that the alleged statement by a teenage neighbor was known to trial counsel or should have been known to trial counsel. The police had discounted the report because the girl was "an airhead or something like that." Moreover, any trial testimony by the girl would have been undercut by testimony from others who saw no signs of activity in Laura's residence on Sunday, the testimony of the forensic pathologist that by Monday Laura had been dead for several days, and Benson's own statement that he had murdered Laura on Saturday night. Accordingly, we agree with the district court that "it would have served no purpose other than to diminish the defense's credibility to attempt to inject [the girl's] faulty memory into the proceedings to challenge the prosecution's case that petitioner committed the crimes, a tactic defense counsel reasonably decided not to pursue in any event."

Given the murder of four persons, Benson's confession, and the lack of any suggestion that anyone other than Benson was responsible for the murders, trial counsel reasonably

could have concluded that further investigation into the details of the underlying crimes and Dr. Gordon's credentials would not be in Benson's best interest. Benson has not shown that the state courts' refusal to entertain his claim of ineffective assistance of counsel at the guilt stage of his trial was an unreasonable determination of fact or contrary to established federal law.

### E. Benson has not shown that there was a prejudicial violation of *Brady*

Benson's second previously uncertified claim is that the prosecution failed to disclose (1) information tending to impeach Dr. Gordon, (2) a lab report showing that Benson had methamphetamine in his urine three days after his arrest, (3) that three witnesses had their pending criminal charges reduced, and (4) officer notes showing that a teenage neighbor visited Laura on Sunday. Benson raised these claims in his first state habeas petition and the California Supreme Court denied the habeas petition on the merits without any explanation.

There are three components to a true *Brady* violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). A *Brady* violation is "material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Amado v. Gonzalez*, 758 F.3d

1119, 1139 (9th Cir. 2014) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

1. *The failure to disclose   Dr. Gordon's judicial reprimand was not prejudicial*

In a prior case involving child molestation,[27] Dr. Gordon, as part of the Sexual Assault Response Team, interviewed a child who had allegedly been sexually assaulted.   The interview was taped, but the tape was destroyed.  The court determined that the tape recording had contained exculpatory statements, and declared that it was "utterly unconvinced that Dr. Gordon failed to recognize that the statement was exculpatory at the time it was made."   In an order entered approximately six months before Benson's trial, the court ruled that "law enforcement including Dr. Gordon, acted in bad faith regarding the tape."

The minute order meets the first prong for a *Brady* violation.  It tends to show that Dr. Gordon is an unreliable witness who may obfuscate or lie in order to convict an alleged sex criminal.  On this record, we accept that the prosecution did not bring the minute order to the attention of Benson's counsel, and that it was suppressed.[28]

---

[27] *See* footnote 26, *supra*.

[28] The state argues that there is "no evidence [the impeaching evidence] was not available as part of the prosecution's open file discovery policy."  The state's argument is not persuasive.  Although the state had an open file policy, Benson's trial counsel reported that he "made a strategic decision that [he] would not relieve the prosecution of its obligation to provide discovery by inspecting the District Attorney's files themselves to determine whether they had been provided everything to which they were entitled."  Moreover, while the information was

Nonetheless, we affirm the denial of relief on the alleged *Brady* violation. To set aside Benson's conviction and sentence, there must be a "reasonable probability" that impeaching Dr. Gordon with evidence of his prior judicial reprimand would have altered the jury's "conclusion that the aggravating circumstances outweighed the mitigating circumstances." *Strickland*, 466 U.S. at 700. Benson has not made such a showing.

The evidence both of guilt and of aggravation was so overwhelming that there is no reasonable probability of a different result had Dr. Gordon's testimony been impeached. The evidence of guilt included not only Benson's confessions to Bolts and Hobson but also the presence of his fingerprints at the scene and evidence that he owned the steel jeweler's mandrel found at the home. The aggravating evidence is similarly overwhelming. Dr. Gordon was tasked with presenting forensic evidence of molestation, and he recounted Benson's description of his acts. But Benson also admitted, in graphic detail, to the police officers his molestation of both young girls as well as his killing of all four members of the family. Thus, Dr. Gordon's testimony was cumulative. Given the overwhelming nature of the aggravating evidence, and that Benson's confession to Dr. Gordon was not the only evidence of molestation, it was reasonable for the California Supreme Court to conclude that the conviction and sentence would have been the same had Dr. Gordon been impeached or his testimony excluded.

---

contained in a public record, we have held that under some circumstances, this does not diminish the state's obligation to produce documents under *Brady*. *Milke v. Ryan*, 711 F.3d 998, 1017–18 (9th Cir. 2013). Here, the record indicates that the information regarding Dr. Gordon was not produced and that counsel would have used it if he had had it.

2.  *Benson has failed to show that the suppression of the lab report was prejudicial*

Benson claims that the government withheld "a lab report [which] indicated Mr. Benson had methamphetamine in his urine three days after his arrest and during the time he was being interrogated." This is the whole of Benson's argument. He does not explain why the report matters or how this information could have been used at trial. That Benson had been a drug addict and had used methamphetamine was not in dispute. Benson's counsel had presented evidence and had argued at trial—without dispute by the state—that Benson was under the influence of drugs over the weekend in question. The inclusion of a lab report showing the presence of methamphetamine in Benson's urine three days after his arrest would not have significantly added to the information that was before the jury.

3.  *Benson has failed to show that the reduction of pending charges against three witnesses had any effect on his conviction or sentence*

Benson argues that prosecutors failed to disclose criminal charges against several lay witnesses and suggests that their charges were subsequently reduced. The criminal records of the witnesses were of marginal relevance because none of the witnesses testified as to where Benson was or what he did over the weekend in question. Benson does not indicate what the defense would have accomplished with this information, how it would have aided the defense at trial, or even that the information was unknown to trial counsel. Benson has not made the requisite showing of prejudice for relief on this issue.

4. *Benson has not shown that the failure to disclose a statement by a lay witness was prejudicial*

Finally, Benson argues that the prosecution withheld notes from a police officer indicating that a teenage lay witness had stated that she visited Laura Camargo and her three children on Sunday evening. Benson's assertion that the witness had told the police that Laura and the children were alive on Sunday is of little weight when placed in context. It appears that Benson knew of the statement because during his discussion with the officers, he described having heard that a teenage girl claimed that she had "talked to Laura about 8:15 the night before the fire." Benson intimated to police that the girl should not be believed, because she was a "champion airhead."

Moreover, as noted, any testimony by the witness would have been undercut by testimony from others who saw no signs of activity in Laura's residence on Sunday, the testimony of the forensic pathologist that by Monday Laura had been dead for several days, and Benson's own statement that he murdered Laura on Saturday night. Accordingly, we agree with the district court that "it would have served no purpose other than to diminish the defense's credibility to attempt to inject [the girl's] faulty memory into the proceedings to challenge the prosecution's case that petitioner committed the crimes, a tactic defense counsel reasonably decided not to pursue in any event."

In sum, on this record, even if some *Brady* materials were withheld, Benson's claim must be rejected because he cannot show prejudice from the alleged non-disclosures. The Supreme Court recently explained:

Petitioners and the Government, however, do contest the materiality of the undisclosed *Brady* information. "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." "A 'reasonable probability' of a different result" is one in which the suppressed evidence "'undermines confidence in the outcome of the trial.'" In other words, petitioners here are entitled to a new trial only if they "establis[h] the prejudice necessary to satisfy the 'materiality' inquiry."

*Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (internal citations omitted). Benson has failed to show a "reasonable probability" that presentation of any or all of the alleged suppressed materials—the prior judicial reprimand of Dr. Gordon, the lab report, the witnesses' criminal records, and the teenage girl's statement—would have changed his conviction or sentence. Accordingly, even though the state court denied Benson's *Brady* claims without explanation, a review of the record reveals sound reasons for the denial.

## V. Conclusion

It has been over thirty years since Benson murdered Laura and her toddler son and sexually abused and murdered her two young daughters. He has been ably represented by his counsel. After reviewing his conviction and sentence pursuant to AEDPA, as we must, we affirm the district court's denial of Benson's petition for a writ of habeas corpus. The California Supreme Court reasonably could have

determined that Benson's confessions to the police should not have been suppressed. Because Benson was a parolee subject to a parole hold, his Fourth Amendment rights were not violated by the delay in his arraignment. Benson's additional evidence concerning his background, mental problems, and horrendous childhood do not compel a determination that he did not knowingly and intelligently waive his *Miranda* rights.

Similarly, the additional evidence of a predisposition to mental illness, exposure to alcohol in his mother's womb, and physical, sexual, and psychological abuse inflicted on him during the two-to-three years he lived at the Buchanan ranch, does not compel a determination that he is entitled to relief under AEDPA. In light of the fact that at the time of his trial neither Benson nor his siblings informed counsel of any abuses at the Buchanan ranch, there is no compelling evidence that trial counsel's performance was deficient. *See Strickland*, 466 U.S. at 687. Moreover, even if counsel's performance were deficient, reasonable jurists could conclude that, in light of the defense offered by trial counsel, the gravity of Benson's offenses, and Benson's prior offenses, counsel's errors were not "so serious as to deprive [Benson] of a fair trial." *Id*.

Finally, Benson's claims that trial counsel was ineffective at the guilt stage of the trial and that the prosecution withheld materials do not merit relief. Benson's confessions, combined with all the circumstantial evidence that confirm his responsibility for the murders and sexual abuse, render trial counsel's decision not to further contest guilt reasonable, if not wise. Viewed in the light of the whole record, there is no probability that production of the so-called *Brady* materials would have produced a different result. *See Turner*, 137 S. Ct. at 1893.

The district court's denial of Benson's petition for a writ of habeas corpus is **AFFIRMED**.

MURGUIA, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's decision on the first certified issue and on the uncertified claims. I cannot, however, join the majority's opinion with respect to Benson's penalty-phase *Strickland* claim. The California Supreme Court unreasonably determined that Benson's counsel provided constitutionally adequate representation at the penalty phase. Even under AEDPA's deferential standard, 28 U.S.C. § 2254(d), Benson is entitled to penalty-phase relief.

Make no mistake, Benson's crimes are brutal and reprehensible. He senselessly murdered Laura Camargo and her three young children—Stephanie, Shawna, and Sterling. He repeatedly sexually assaulted Stephanie and Shawna before killing them. And he ruthlessly burned the bodies of his victims to hide the crimes.

But whether or not Benson's crimes are abhorrent does not determine whether he is entitled to constitutionally adequate representation. At the penalty phase of his trial, Benson's attorney had a professional duty to explain those crimes, and the person who committed them, to the jury. Indeed, his counsel's job—and that of any lawyer defending a client facing the death penalty—was to explain what, in Benson's life, might have driven him to commit such heinous acts so as to shed some amount of human light on his behavior. This means, concretely, that Benson's attorney was

duty-bound to investigate and present mitigating evidence that could give the jury a reason to exercise some measure of mercy for crimes that otherwise warrant none.

Significant evidence of that nature existed here. From infancy until the age of nine, Benson was subjected to grotesque sexual and physical abuse at the hands of his foster family, the Buchanans. And although readily available, this evidence was never discovered by Benson's lawyer and was, therefore, never introduced at the penalty phase of Benson's trial. Mitigating evidence of this magnitude clearly has a substantial probability of convincing at least one of twelve jurors to exercise mercy and vote for life rather than death. The California Supreme Court's conclusion to the contrary is fundamentally unreasonable.

I must, therefore, respectfully dissent.

# I

Benson's biological parents abandoned him at birth and sent him to live with the Buchanan family on a ranch in rural Petaluma, California. Each of Benson's six brothers was eventually sent to the ranch, which the boys referred to as their foster home. Their foster parents, Marjorie Buchanan and her husband Jack, ran the ranch. Marjorie's son, David, also lived on the ranch.

According to the declarations submitted by two of Benson's brothers, life on the Buchanan ranch was a veritable

hell.[1]    All of the boys were physically, sexually, and psychologically abused while living there.  The physical abuse was extreme.  Marjorie beat at least one of the boys every day.  She beat them with a rubber hose, branches, and a belt.  She even hit Benson, at around the age of six, over the head with a shovel.  She would punish the boys by placing their hands on a hot stove; filling their mouths with cayenne pepper; and holding their heads underwater to stop their crying.   At least once, Marjorie held Benson's head underwater until he lost consciousness.  Another time, as punishment for leaving a gate open, Marjorie tied Benson's limbs spread-eagle across the gate and beat his genitals with a rubber hose and ping pong paddle.  Benson was seven or eight years old at the time.

Jack, Marjorie's husband, also beat the boys.  He would use the buckle-end of a belt to hit the children and would "kick [Benson] in the head and ribs when [he] fell down during a beating."  On one occasion, he beat Benson for so long and so severely that Benson's brother, William, feared for Benson's life.

According to his brothers, Benson was subjected to the worst of the beatings.  At times, Benson was beaten so badly that he could not walk, nor could he go to school.  After beatings, Benson's face and body would be so severely bruised and swollen that his brothers were embarrassed to go to school with him.  Benson would withdraw and would

---

[1] The evidence of Benson's life on the ranch comes from declarations from Benson's brothers, Brad and William.  These declarations were presented to the California Supreme Court, but Benson was never afforded an evidentiary hearing to further develop his penalty-phase *Strickland* claim.

refuse to speak after severe beatings. He would bang his head against a wall and eat dirt and live bugs.

Benson and his brothers were also routinely sexually abused on the ranch by David, their older "foster brother." According to William Benson, the sexual abuse "happened so much that we all thought it was normal." David would fondle the boys and orally copulate them. He would take the boys into a treehouse, away in a car, or tie them to a chair or tree and sexually abuse them. He forced the boys to have anal intercourse with him and inserted foreign objects into their anuses, including an electric cattle prod.

In addition to sexual abuse, David forced the boys to engage in bestiality and wanton torture of animals. He made the boys put their penises in calves' mouths and pigs' vaginas. He would put the electric cattle prod in the cows' throats and pigs' rectums and turn the electricity on. He made the boys watch as he sledgehammered animals to death, and he would make the boys clean up the animals' feces after they were killed. He made the boys bite the testicles off sheep and drink the animals' blood. When the boys did not comply, David would beat them.[2]

Though it should have been, the jury was not informed of all of these monstrous details regarding Benson's life on the ranch.

---

[2] Benson's brothers' declarations describe additional deviant acts that occurred on the ranch—including forced enemas, forced sexual contact with adults, and witnessing other acts of bestiality.

## II

In short, Benson's childhood on the ranch was remarkably horrific. Benson's counsel, nevertheless, failed to discover the abuse despite being put on notice by a mental health expert and his own investigator that physical and sexual abuse—specifically, on the ranch—likely occurred during Benson's childhood.[3] Counsel therefore failed in his duty to perform a reasonable investigation, rendering his performance at the penalty phase patently deficient. *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Andrews v. Davis*, 944 F.3d 1092, 1108–10 (9th Cir. 2019) (en banc). It was unreasonable for the California Supreme Court to conclude otherwise. *Wiggins v. Smith*, 539 U.S. 510, 520–34 (2003); *Andrews*, 944 F.3d at 1115–16.[4]

---

[3] The majority errs when it suggests that the only abuse of which Benson's counsel was aware was that Marjorie "disciplined" the boys with pepper and hit them with a rubber hose. Maj. Op. at 54. I assume, although skeptically, that those punishments—specifically, filling a child's mouth with cayenne pepper and striking a child with a rubber hose—would not trigger counsel's duty to investigate that abuse more thoroughly. But Benson's counsel knew more than that. He also knew that his mental health expert suspected Benson had been sexually abused in the past and that Benson's brother had been sexually abused by David, who was later convicted of molesting children. *Any* reasonably competent attorney aware of those two facts would have undertaken further investigation of Benson's relationship with David and, more generally, of Benson's life on the ranch.

[4] Because Benson's counsel failed in his duty to investigate, it is irrelevant whether the strategy counsel adopted at the penalty phase was reasonable. That is, counsel's performance can still be deficient under *Strickland* based on the failure to adequately investigate, even if the strategy counsel ultimately settled on was superficially reasonable. *Wiggins*, 539 U.S. at 521–22. The majority thus errs by crediting counsel's strategy. *See* Maj. Op. at 53–57. The relevant question is

## III

The admittedly more difficult question relates to prejudice. *See Strickland v. Washington*, 466 U.S. 668, 694–96 (1984). Indeed, the question the California Supreme Court had to answer—and the decision we review under AEDPA for substantive unreasonableness—was whether there was a "reasonable probability" that the omitted evidence would have altered the outcome of the penalty phase. *Wiggins*, 539 U.S. at 537. That is, whether there was a *reasonable probability* that the omitted mitigating evidence would persuade a single juror that—despite the violence and suffering Benson inflicted on others—he should be sentenced to life in prison rather than death. *Id*. The California

---

whether counsel's *investigation* was reasonable under the circumstances. *Wiggins*, 539 U.S. at 523; *Andrews*, 944 F.3d at 1111–16.

Additionally, although Benson himself had no memory of the abuse he suffered on the ranch, the Supreme Court has recognized that a client's representations, or lack thereof, do not excuse counsel's investigatory responsibilities. For example, a client facing the death penalty may be "fatalistic or uncooperative," but that does not relieve counsel of his independent duty to investigate the client's background. *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (per curiam).

Simply put, counsel had a duty to investigate Benson's life on the ranch—not to make assumptions about what his life was like. Had counsel fulfilled that duty, he would have discovered evidence of the abuse Benson suffered. And any reasonably competent attorney would have presented that mitigation evidence at the penalty phase.

Accordingly, Benson's counsel had an independent duty to investigate *and*—contrary to the majority's inaccurate characterization of the record, *see* Maj. Op. at 55 n.22—was sufficiently aware of facts pointing to a probability that Benson had been severely abused on the ranch, *see supra* note 3.

Supreme Court concluded such a reasonable probability did not exist.  That determination is objectively unreasonable.

The question is *not* whether jurors, presented with the evidence, would nonetheless have voted for death.  Rather, the question is whether the omitted evidence was of such a magnitude that there was a reasonable probability the outcome would have been different.  *See Buck v. Davis*, 137 S. Ct. 759, 776 (2017) (applying *Strickland*'s prejudice prong).   No fair-minded jurist objectively reviewing the unintroduced mitigating evidence in this case could conclude, *with confidence*, that the outcome would have been the same. *See Strickland*, 466 U.S. at 694.  There is simply "too much mitigating evidence that was not presented to now be ignored."  *Porter*, 558 U.S. at 44 (internal quotation marks omitted).

The majority's most severe error is its conclusion that the evidence of Benson's life on the ranch was "cumulative" of other mitigating evidence.  Maj. Op. at 61, 64 n.25.  Contrary to the majority's conclusion, the mitigating evidence actually presented at the penalty phase *pales* in comparison to the evidence of the suffering imposed on Benson at the ranch.  It is not a difference in magnitude, but a difference in kind.  The unintroduced mitigating evidence of unprovoked, grotesque abuse inflicted on Benson as a child is precisely the type of mitigating evidence that could have moved the jury to sentence Benson to life in prison rather than death.  *See Wiggins*, 539 U.S. at 535; *Boyde v. California*, 494 U.S. 370, 382 (1990); *Andrews*, 944 F.3d at 1116–18.  It is the type of evidence that "alter[s] the entire evidentiary picture," and its omission undermines confidence in the penalty phase verdict. *Strickland*, 466 U.S. at 696; *see Andrews*, 944 F.3d at 1121.

Given Benson's attorney's inadequate representation, the jury that sentenced him to death was unable to fully evaluate Benson's moral culpability for his actions. Unless certain crimes are beyond the reach of prejudicial error—or we view jurors as immovable and incapable of exercising mercy—then the omission of the mitigating evidence here must be considered prejudicial.

The aggravating factors in this case are substantial, to be sure. But so, too, is the mitigating evidence that was not introduced. Although I cannot say with certainty that the penalty-phase result would have been altered had counsel investigated and introduced evidence of Benson's childhood on the ranch, the evidence is sufficiently significant that my confidence in the penalty is undermined. Any fair-minded jurist would agree.

I respectfully dissent.